PHILIP SORENTINO AND CONSTANCE SEVERINI, PLAIN-
TIFFS-APPELLANTS, v. THE FAMILY AND CHILDREN'S
SOCIETY OF ELIZABETH, JOHN DOE AND JANE DOE,
DEFENDANTS-RESPONDENTS.

Argued June 16, 1977—Decided September 19, 1977.

314

*Ms. Gail Chester* argued the cause for appellants (*Mr. Melville D. Miller, Jr.,* Administrator, Middlesex County Legal Services, attorney).

*Mr. Stuart L. Pachman* argued the cause for respondents John and Jane Doe (*Messrs. Clapp & Eisenberg,* attorneys; *Mr. Pachman* and *Mr. Jerome C. Eisenberg,* of counsel and on the brief).

*Ms. Rosemary Higgins Cass* argued the cause for respondent The Family Children's Society of Elizabeth.

PER CURIAM. These proceedings have their origin in the attempt of an unwed mother to regain custody of the child she had surrendered for placement for adoption by an adoption agency, The Family and Children's Society of Elizabeth. This Court previously found sufficient evidence to support the trial court's finding that the natural mother's consent to surrender to the agency had not been voluntarily given. Therefore, on the record then before us, the surrender was void *ab initio* and the mother "[could] not be held to have lost her rights to custody of the child merely because it might be determined that the best interests of the child, in the ordinary sense, would be promoted by the adoption rather than by returning the child to the natural parents." *Sorentino v. Family & Children's Soc. of Elizabeth,* 72 *N. J.* 127, 131 (1976) (hereinafter *Sorentino* I). Moreover, the father, having legitimatized his relationship to the child by

his subsequent marriage to the mother, also retained those rights of a natural father at the birth of a child. 72 *N. J.* at 134. However, because the child had been in the custody of prospective adopting parents from July 9, 1974, one month after birth, to December 17, 1976, the date of our decision (a period of some 31 months), the case was remanded to the Chancery Division for a hearing on what then remained as the single question in the case, namely, "whether transferring custody of the child to plaintiffs * * * will raise the probability of serious harm to the child." 72 *N. J.* at 133. The burden of proof on this issue was placed on the plaintiffs, as they were seeking to alter the status quo of the child.

At the hearing the trial judge took testimony on that issue from both plaintiffs, the child's pediatrician, plaintiffs' expert, defendants Doe and their three expert witnesses. Promptly thereafter he rendered his decision continuing custody in the defendants-adoptive parents. He concluded that plaintiffs had failed to satisfy him by a fair preponderance of the credible testimony that transfer of the child would not raise the probability of serious harm to the child, the "convincing evidence" being to the contrary. Plaintiffs seek review of that determination consistent with the provision in our earlier opinion that "any party may notice the matter for review in this court * * *," 72 *N. J.* at 133, for which purpose we retained jurisdiction. In addition defendants have petitioned the Court directly for a determination that under all the circumstances now obtaining they are entitled to adopt the child.

I

With respect to the initial issue in the case, that is, whether custody should remain with defendants, four points are presented for our consideration. The first, which need not long detain us, is that the trial court should have permitted plaintiffs to produce certain alleged expert and

lay testimony directed to the effect upon a child when told it has been adopted. Scheduling difficulties prevented the production of these witnesses (whose names and copies of whose reports had not been timely furnished to defense counsel as agreed) in the order in which they ordinarily would have appeared in the course of plaintiffs' case. Were there any error, which we do not perceive, in the trial judge's exercise of discretion in not permitting these witnesses to testify after all the other evidence on both sides had been presented, it was completely dissipated by his acceptance of the fact, as stated on the record, that while there are "problems" with regard to adopted children, those problems do not always arise in every case. To the extent that the witnesses would have supported this general thesis by resort to actual examples, the court dealt with the offer of proof by accepting the conclusional facts of their sum testimony that "the adoption in those specific cases brought on dramatic emotional consequences in the adopted child's life." Under the circumstances no prejudice inured to plaintiffs by the barring of these witnesses' testimony, the substance thereof having been duly considered by the court.

█ Nor was there any error, as alleged, in the refusal of the trial judge to disqualify himself by virtue of the fact that he is the father of adopted twins. As it happens, this judge had also been the father of a natural daughter who died several years ago. In any event the argument for disqualification is almost specious, for if an adoptive parent could not judge this case simply because of his adoptive status, then the asserted ground for disqualification presumably could be argued by putative adoptive parents and applied with equal force against a judge who was a natural parent. And it might well be urged that a judge who never enjoyed the blessings of parenthood would likewise be without the qualifications to decide any custody matter, not because of potential prejudice or conflict but rather because of the lack of any experience upon which to form an understanding of the relationships involved. Were all of these

contentions accorded respectability, there would be no pool
of judicial officers from which to draw a judge for this case.
In any event we have no difficulty in avoiding this arti-
ficial quagmire. Nothing in the record before us calls for
the application of either the disqualification statute, *N. J.
S. A.* 2A:15–49, or our rule on the subject, *R.* 1:12–1.

Plaintiffs' next contention is couched in federal
constitutional terms, the argument being that this Court has
denied the petitioners their Ninth and Fourteenth Amend-
ment rights by depriving them of "the presumption of a
primary right to the custody of their natural child and
impos[ing] the burden of proving that no serious psycho-
logical harm would come to the child upon transfer to the
natural parents." Assuming, *arguendo,* that such a right
may be found in the Constitution (see, *e. g., Armstrong v.
Manzo,* 380 *U. S.* 545, 85 *S. Ct.* 1187, 14 *L. Ed.* 2d 62
(1965); *Griswold v. Conn.,* 381 *U. S.* 479, 85 *S. Ct.* 1678,
14 *L. Ed.* 2d 510 (1965); *Stanley v. Illinois,* 405 *U. S.*
645, 92 *S. Ct.* 1208, 31 *L. Ed.* 2d 551 (1972)), assuredly
it is not absolute. Indeed, plaintiffs appear to concede as
much in their brief by conditioning any such primary right
to custody on the absence of "some overriding consideration
[which] dictates a termination of that right." Just such an
overriding consideration was projected in the first appeal in
this case — the "potentiality for serious psychological harm"
resulting from a transfer of custody from the intending adop-
tive parents to the natural parents in view of the substan-
tial period of time that the child had been in the only
real home she had known. *Sorentino I, supra,* 72 *N. J.* at
133. The whole point of the remand was to determine
whether that risk would likely become a reality. On this
issue the trial judge found, as we have already observed,
not only that plaintiffs had failed to sustain their burden
of proving that such a transfer would "not raise the proba-
bility of serious psychological harm to the child", but fur-
ther that the "convincing evidence" was to the contrary of
that proposition.

As part of this argument plaintiffs complain that they should not have had to bear the burden of proof on the issue of serious harm to the child. On this question the Court was divided in *Sorentino I*. We need not, however, reconsider that basic question here, for it is apparent that no matter where the burden of proof lay, the trial judge would have reached the same conclusion on the proofs before him. This is evident from his inability, in his words, to "give credence to the validity of the opinion of [plaintiffs' expert] as it relates to the central issue", whereas he did find the testimony of defendants' experts "persuasive and convincing." And, as indicated, this "convincing evidence" negated the absence of the probability of serious harm to the child. Under the circumstances the question of whether the burden of proof was properly shouldered by plaintiffs becomes academic.

■ Plaintiffs' final argument is that the trial judge's conclusion that the child would be harmed by a transfer of custody to his natural parents is contrary to the weight of the evidence. Quite the opposite is true. The overwhelming evidence, including the testimony, the medical and scientific authorities, and the legal literature on the subject, supports the trial court's conclusion. One excerpt from the judge's findings referring to the testimony of defendants' experts, which, as noted, he found "persuasive and convincing," is sufficient to dispose of plaintiffs' contention:

They were unanimous in their opinion that if transfer of custody were ordered, it would not only be beset with immediate serious psychological and emotional harm to the child, but that also there was a strong likelihood and a potential for such harm to continue throughout her lifetime, characteristics being that the child would suffer acute depression, act out with rebellious conduct and suffer feelings of anxiety, fearfulness, insecurity and inadequacy.

They further agreed that although professional help is available, at most it would only ameliorate the harm but would not eradicate it.

Accordingly, the trial court's judgment that custody of the child shall remain with the defendants is affirmed.

## II

That brings us to the question of what ultimately is to be the status of the child's legal parentage, not entirely answered, of course, by a determination of the custody issue,[1] but rather dependent upon the eventual outcome of defendants' effort, restrained by the Chancery Division (see *Sorentino* I, 72 *N. J.* at 130), to adopt the little girl. As noted, defendants petitioned this Court directly for an order of adoption. We address this issue in the interest of finalizing this child's status and bringing an end to these proceedings, which doubtless have been a source of torment to all involved. There are in the balance, in addition to the profound emotional consequences implicit in the finality of adoption, "all relationships" and "all rights, duties and obligations * * * founded upon [the] relationships" between the child and the contending parties to this litigation, *N. J. S. A.* 9:3–30, including, of course, the right of inheritance by intestacy. See *In re Adoption of Children by D.*, 61 *N. J.* 89, 92–93 (1972).

Our recent decision in *Sees v. Baber*, 74 *N. J.* 201 (1977), reminds us that as a condition precedent to final adoption there must be a termination of the rights of the natural parents, 74 *N. J.* at 210, citing *In re Adoption by R. D.*, 127 *N. J. Super.* 311 (App. Div.), certif. den., 65 *N. J.* 292 (1974), and *In re Adoption of J.*, *supra*, 139 *N. J. Super.* at 538–39 and that other than in cases of voluntary surrender to an approved agency, "[u]nder the adoption statute, parental rights may not be terminated unless it is determined by the court that a parent suffers from a specific statutory disability or has engaged in parental conduct amounting to 'forsaken parental obligations.' *N. J. S. A.*

---

[1]"[A]doption, allowing for no future change, differs from an award of custody, which is impermanent and may be changed as circumstances require." *In re Adoption of J.*, 139 *N. J. Super.* 533, 548 (App. Div. 1976), rev'd on dissent below, 73 *N. J.* 68 (1977) (dissenting opinion).

9:3–24C." *Sees v. Baber, supra,* 74 *N. J.* at 210. The statutorily-specified grounds (death, mental incompetency, or, in the divorced parents situation, adultery or desertion or extreme cruelty) not being present in this case, "forsaken parental obligations" remains as the only statutory basis for terminating plaintiffs' parental rights in this child.

We pause here to acknowledge that in *Sorentino I* there was at least an implied determination that there was *then* no basis for terminating parental rights. 72 *N. J.* at 131. Notwithstanding that conclusion, however, at this juncture we think it not inappropriate for the termination issue to be reopened. Defendants, by their petition for adoption, in effect call for a reconsideration of the issue of whether there should, on the *present* record, be a termination of the rights of the natural parents. Whereas previously our focus was fixed not so much on whether plaintiffs had abandoned their parental obligations or eschewed their parental rights as on the element of statutory consent and surrender as the sole basis for possible termination, the time has now come in the wake of changed circumstances and a more fully developed record to reevaluate and reassess plaintiffs' conduct exclusively to determine whether it amounts to a forsaking of parental obligations so as to result in a termination of their parental rights — a decision not to be lightly made. In considering this question we are mindful of the statutory definition of "forsaken parental obligations" as "willful and continuous neglect or failure to perform the natural and regular obligations of care and support of a child", *N. J. S. A.* 9:3–18(d), which requires "a past course of conduct amounting to intended abandonment or very substantial neglect of both parental duties and claims, with no reasonable expectation of any reversal of that conduct in the near future." *In re Adoption of Children by D., supra,* 61 *N. J.* at 94–95; see *Sees v. Baber, supra,* 74 *N. J.* at 210–211.

A paramount concern of the Adoption Act is the maintenance of stable, continuing relationships between par-

ent and child. This is the basis for the policy behind custody cases which provides for parental visitation. The parent-child relationship is maintained with the hopeful expectation that the natural parent will be able in the future to resume permanent custody of the child. See, *e. g., Doe v. G. D.,* 146 *N. J. Super.* 419 (App. Div. 1976), *aff'd sub nom., Doe v. Downey,* 74 *N. J.* 196 (1977), see also *Scanlon v. Scanlon,* 29 *N. J. Super.* 317 (Ch. Div. 1953). Similarly, this policy underlies the decisions of our courts which refuse to terminate the parental rights of the non-custodial parent in the "divorced parents" situations. Children in that circumstance are accorded the permanence of their relationship with the custodial parent without severing the existing relationship with their non-custodial parent. See *In re Adoption of Children by D., supra; In re N.,* 96 *N. J. Super.* 415 (App. Div. 1967). These decisions promote that policy of the Adoption Act which calls for the protection of the child from unnecessary separation from his natural parent. To grant an adoption and, concurrently, to terminate parental rights in these cases would result in a separation from the emotional and psychological relationship which the child still has with the non-custodial parent.

However, where that relationship does not exist, there can be no separation. This is especially so where the absence of any such relationship has been occasioned by the purposeful conduct of the natural parent or by indifference or neglect. In that event another important policy of the Act comes into play: the protection of the stability and permanence of the new familial grouping. In those situations our courts have recognized the absence of a relationship, classified the abandonment as a forsaking of parental status where the facts warranted it, terminated the unutilized legal right and granted the adoption. See *In re A. B. M.,* 132 *N. J. Eq.* 434 (E. & A. 1942) ; *In re Jacques,* 48 *N. J. Super.* 523 (Ch. Div. 1958).

In sum, those cases in which our courts have refused to terminated parental rights have encouraged the maintenance

of an existing relationship. *In re Adoption of Children by D., supra; In re Mrs. M.,* 74 *N. J. Super.* 178 (App. Div. 1962) *Scanlon v. Scanlon, supra; S. M. v. S. J.,* 143 *N. J. Super.* 379 (Ch. Div. 1976). Those cases in which our courts have terminated parental rights on grounds of forsaken parental obligations have encouraged the establishment of a permanent home by protecting the child from interference from a parent with whom it has no relationship. See *Lavigne v. Family and Children's Society of Elizabeth,* 11 *N. J.* 473 (1953); *In re Adoption by P.,* 114 *N. J. Super.* 584 (App. Div. 1960); *In re Jacques, supra.*

▉ In the case before us, the Sorentinos have had no existing relationship (save one of blood) with the child. The little girl was born on May 5, 1974, and was surrendered to defendant agency on May 30. The prospective adopting parents took custody on July 9, 1974. While sporadic requests were made thereafter for the agency to effect the return of the child, the adoptive parents were completely unaware of these developments. Plaintiffs delayed instituting their suit for custody until July 9, 1975, a full year after the Does had assumed custody. A foreseeable result from that delay was that the child would become firmly established in her adoptive home. Such equivocation and indecision on the part of the natural parents, with predictable consequences, are harmful to the well-being of the child and are relevant in the consideration of the issue of abandonment and termination. See *In re Nicky,* 81 *Misc.* 2d 132, 364 *N. Y. S.* 2d 970, 975 (Surr. Ct. 1975), *aff'd,* (App. Div. November 24, 1975, unreported), cited with approval in *Sees v. Baber, supra,* 74 *N. J.* at 216–217; see also *In re P., and Wife,* 114 *N. J. Super.* 584 (App. Div. 1971). Here, the passage of time permitted the roots to be nurtured and to develop fully. Hence it would appear that no policy of the Act would be ignored by the termination of plaintiffs' rights, should that eventually be deemed appropriate, because there can be no unnecessary separation from a non-existing relationship. In that event, such termination would tend to promote the

policy of preventing interference by establishing the little girl permanently in the home of her adoptive parents. These, however, are issues which cannot now properly be determined at this level.

What we have said, speculatively, with respect to these questions does not run counter in any respect to *Sees v. Baber, supra,* but rather complements that decision. Although plaintiff Sees, like the Sorentinos, had no existing relationship with her child, the case is otherwise readily distinguishable. The unwed mother in *Sees* made a hasty decision to surrender her child, without the advantages of frequent and competent counseling from an approved agency as was available to Constance Sorentino. Perhaps most significantly, plaintiff Sees changed her mind two days later, immediately communicated this decision to the defendants, and promptly instituted the action for the return of the child. During the entire length of the proceedings in *Sees,* the putative adoptive parents knew of the request and only their refusal to return the child after two days prevented the natural mother from establishing a relationship with her child. In the case before us, the record reveals that the adoptive parents had been enjoying a secure and warm relationship with the child for a full year before they ever heard of the natural parents' request for return of the little girl — and that quite by accident, through a newspaper article. As we pointed out in *Sees,* commenting there on *Sorentino I,* "[t]he adoptive parents thus relied upon the conduct of the natural parents, with the further encouragement and assurance of an approved agency. Reasonably secure in the custody of the child, they gave as fully as possible their love, emotions, time and wherewithal to the child. In consequence, with resultant delays abetted by litigation, a parent-child relationship was permitted to grow and to flourish. The natural parents by their own conduct contributed measurably to this result." 74 *N. J.* at 224.

In addition, the decision in *Sees* not to terminate the parental rights of the natural mother is consonant with two important policies of the Adoption Act. It furthers the policy .of protecting the natural parent from making a hurried or abrupt decision to give up the child, and it promotes the policy of the Act to encourage adoptions made through approved agencies where counseling and services are available for all parties concerned and to discourage adoptions through private placements where the interests of adoptive parents are served at the expense of the interests of the child. *Sees*, then, is the other side of the *Sorentino I* coin.

### III

As part of their brief the defendants have submitted a "supplemental petition" in which they move that this court "enter a Judgment of Adoption as to the child reciting that her name be changed to that of defendants Doe, and that the true name be reflected in the sealed record." As may be gathered from our comments, the record points strongly to the conclusion that there has been an abandonment. The purposeful delay and indecision, with resultant continuing cementing of the newly-established relationship between the child and defendants, have been recounted above. In addition there is the most recent proceeding involving custody, which is germane to the issue of termination. While we share the parties' anxiety to terminate this case, there has been no notice to plaintiffs, except for the one page "supplemental petition" referred to, that final adoption was a live issue in the case. A decent respect for the rights of everyone involved in this emotion-laden situation calls for due process to be recognized by a remand to the Chancery Division to entertain the Does' application for adoption, consistent with this opinion. The trial court will consider the record made thus far in the previous proceedings, plus any additional admissible evidence submitted by either the plaintiffs or the Does. The restraint heretofore entered

against the institution of an adoption proceeding is hereby dissolved.

On the remand, as in any other proceeding to terminate the rights of parents, the putative adoptive parents will bear the burden of proving by a preponderance of the credible evidence that the rights of the Sorentinos should be terminated. The trial court should assign to some approved agency other than the defendant The Family and Children's Society of Elizabeth the obligation of furnishing a written report as required by *N. J. S. A.* 9:3–23(B).

If the defendants succeed in carrying the burden of proof, the Chancery Division shall terminate the rights of the natural parents and proceed with the final hearing as required under *N. J. S. A.* 9:3–27, all the requirements of *N. J. S. A.* 9:3–23(A) having then been fulfilled. Any party may notice the matter for review in this court within thirty days of the rendition of the trial court decision, for which purpose we retain jurisdiction.

So ordered.

*For affirmance and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.