173 N.J. Super. 33 (1980)
413 A.2d 350
M. ARTHUR BECK, PLAINTIFF-RESPONDENT,
v.
SUSAN M. BECK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 4, 1979.
Decided February 27, 1980.
Before Judges CRANE, MILMED and KING.
Carol Eisenberg argued the cause for appellant (Rose, Poley & DeFuccio, attorneys).
*34 Howard Stern argued the cause for respondent (Stern, Steiger, Croland & Bornstein, attorneys; Howard Stern, of counsel; Myra T. Peterson on the brief).
The opinion of the court was delivered by MILMED, J.A.D.
The basic issue in this matrimonial suit involves the propriety of the sua sponte determination of the trial judge, included in the June 12, 1979 judgment of divorce, committing the two minor children of the parties to their "joint custody" on a "time sharing" schedule, the children to be with each parent for four continuous months with visitation with the other parent every other weekend. Defendant Susan M. Beck appeals from this part of the judgment as well as from the portion "which provides for support for the infant children of the marriage based upon the joint custody arrangement."
The essential facts are not in dispute. The parties were married in 1963 and have two adopted children, girls now of the ages of 11 and 9 years respectively.[1] In February 1976 plaintiff M. Arthur Beck moved out of the marital home, and in September 1977 he instituted this suit seeking a divorce on "no fault" grounds, N.J.S.A. 2A:34-2(d). His complaint made no formal demand for custody of the children. Rather, he asked for "reasonable and liberal rights of visitation with the children." Defendant filed her answer to the complaint, along with a counterclaim seeking dissolution of the marriage on the ground of plaintiff's willful and continued desertion of her for more than 12 months, N.J.S.A. 2A:34-2(b). She specifically sought custody of the two infant children who continued to live with her in the marital residence after plaintiff left in 1976.
Following the close of proofs the trial judge delivered an oral opinion in which he found that the parties live in the same *35 community, viz., Clifton;[2] that there have been no visitation problems, plaintiff has visitation "with no difficulty whatsoever" between defendant and himself; that although he (the judge) had not interviewed the children, and although plaintiff had made no formal demand for custody, there was an apparent need in this case, particularly because the children are adopted, for them "to have the benefit, contact, and security of both parents"; that "the need for the security and contact of both parents is particularly suited in this case by reason of the proximity and presence of both parties in the same community"; that "children of divorce are, particularly in a case such as this where they are adopted, best able to keep [sic] with the trauma of divorce by the maximum amount of contact, control, and supervision of both parties, and despite the assumed insinuation of animosity between the parties," and that at one time (in 1978) plaintiff did strike and injure defendant. The trial judge "denied" plaintiff's cause of action for divorce; granted defendant's cause of action for divorce on the ground of desertion as set forth in her counterclaim; provided for equitable distribution of the marital assets; directed that the parties shall have "joint custody" of the children[3] and that they are "to select a family counsellor or a counselling agency" who would be available "to *36 mediate differences, if there should be any," and for counselling; set the amount of alimony for defendant-wife; provided for the support and maintenance of the children; required defendant to pay for her household expenses when she has the children, including food, consumables and all clothing for the children, and awarded a counsel fee of $7,500 and an accounting fee of $2,500, to be paid by plaintiff, for legal and accounting services rendered on behalf of defendant.
Defendant, by motion in the trial court, sought: (1) amendment of the trial judge's findings "insofar as they conclude that an order of joint custody would be in the best interests of the parties' children," and (2) amendment of the judgment "by striking the provision for joint custody and directing, instead, that sole custody be awarded to the defendant, and adjusting the award of child support accordingly." She advanced the following grounds:
... that (i) the Court is without authority to make an award of joint custody; (ii) plaintiff made no demand for custody in his Complaint or at trial and there was no indication that the present custody arrangement is deleterious to the welfare of the children so as to permit the Court to raise the issue of custody sua sponte; and (iii) there is insufficient evidence in the record to support such findings and judgment in that no testimony was taken on the issue of custody, no Probation Department report was ordered or made, and the parties' children were not interviewed.[4]
As a consequence of the motion, the trial judge scheduled "a plenary hearing as to the custody of the infant children" and directed that "a Diagnostic Center evaluation of the parties and the children be held forthwith." Both the trial judge and this court denied defendant's application for a stay of the plenary hearing and Diagnostic Center evaluation. Thereafter, the trial judge dispensed with his requirement for a Diagnostic Center evaluation. He conducted a plenary hearing at which he heard *37 the testimony of a specialist in psychiatry and child psychiatry; the defendant-mother; a psychologist and associate professor at Rutgers University; a clinical psychologist, and a psychiatric social worker. The plaintiff-father did not testify at this hearing.
The trial judge interviewed the two children in his chambers, with no one else present. He pointed out that "they clearly do not want to have a joint alternating living arrangement as ordered by the court. They want to live at Robin Hood Road [the marital residence] with their mother." He reported:
I even asked them suppose they even change houses and your father moves to Robin Hood Road and your mother gets a new house. Is it the house you want to stay in? You'll stay at Robin Hood Road with your father and they said no. They would want to live with their mother wherever she moves to, but they like being with their father and they love their father and they love their mother and they certainly want to continue the visitation.
He found the children to be "sincere and honest in their beliefs."
Defendant, a college graduate with two master's degrees, testified that all of her "graduate work and undergraduate work was in education, guidance, child growth and development." She reported that ever since the trial judge announced his initial decision regarding joint custody, her relationship with plaintiff has been "[t]errible." She gets "physically upset when [she has] to look at him or talk to him...." She does not feel that she could cooperate with him and have open lines of communication with him in an alternating custody arrangement.
We note here that plaintiff, who is a commercial photographer, is "on location six to eight times per year." He says, however, that "[w]hen I would have the children in my custody, I would not take any location trips. I can be that selective." *38 He also says that he "would not depend completely on Mrs. Hartke [defendant's mother] to take care of the girls"; that he "would hire outside help."
Dr. Jerome D. Goodman, who specializes in psychiatry and child psychiatry, testified on behalf of defendant. He examined the children and met with defendant but not with plaintiff. In his opinion, "custody with the mother, so that the constancy of the environment remains unimpeached, is preferable with liberal visitation privileges for the father." He reasoned that, among other things, "adopted children even more than other children require constancy of environment to enhance their security options"; that "their feelings of identity are already at risk far above those of biological children"; that changing homes every four months would cause embarrassment for the children, especially since they are adopted; that the divergent child-rearing practices of the parents could cause the children to become insecure, depressed, manipulative, and subject to social maladjustment; and that cooperation and open lines of communication between parents is critical for an alternating custody arrangement. He expressed the view that "if the parents and the children are all in favor of" an alternating living arrangement, then he "could see that it could be possible." He added that in this case "the best interests of these children would not be well served" by imposing an alternating custody arrangement; that alternating custody is an unusual arrangement and is particularly unusual in the case of adopted children. He noted that
When I, as any professional, see children who are well integrated as these children are, I think that the status quo is preferable.
Dr. Leonard Abramson, Dr. Warren Donald Clark and Dr. Judith Brown Greif testified on behalf of plaintiff. Dr. Abramson, a clinical psychologist, spent two hours with plaintiff interviewing him and administering two tests. He found plaintiff to be "mature and well adjusted."
*39 Dr. Clark, a psychologist and associate professor, interviewed the children. He "saw them together with their father and ... also saw them separately."[5] Both children told him that "they wanted to live with their mother" and that their "father becomes very angry and that he hit their mother." They "identified their father as a liar." However, in his opinion the girls are capable of adjusting to "joint custody" because they are adjusted, intelligent children who have affection for and care about both parents. He also noted that they "care about a relationship with both the mother and the father" and believed "that joint custody fosters that relationship." He also testified that he had not "seen" the "particular [alternating custody] arrangement" contemplated by the trial judge and has "no experience as to how that might work." Referring to the "time arrangement" involved, "the alternating four and four and four," he pointed out that "there should be some rationale as to why that is an effective way of handling the joint aspects of the parent's contact."
Dr. Judith Brown Greif, a psychiatric social worker, the chief social worker of the Division of Child and Adolescent Psychiatry of Bronx Municipal Hospital of the Albert Einstein College of Medicine, testified on behalf of plaintiff. She did not interview any member of the Beck family. She testified as an advocate of joint custody arrangements and told of her involvement in a study of joint custody and its effects. In her "case study" the type of alternating custody proposed by the trial judge "was not one of the ones that was practiced." Also, none of the "joint custodial arrangements" in the study were "Court ordered." Beyond this, in her study, whether the children wanted the joint custodial arrangement or not "was not taken into consideration" and, "[t]he research ruled out adopted children because that *40 might be a variable in their [the fathers] feelings about the child...."
Following the hearing, the trial judge reaffirmed his decision concerning "joint custody." In the course of arriving at this determination, he observed that:
Mr. Beck's prior arrangements with the girls, his lack of being the involved parent, even when they were living together, the contention is and there was nothing to controvert it, it was Mrs. Beck who always nurtured them, followed through on their needs, looking to the schooling problems, met with the teachers, apparently took them shopping....
... when he [Mr. Beck] was not working and had the opportunity to relax, his relaxation time is important to him, a great deal of testimony that golf is a good part of his life and when it's golf time, it can't be custodial parent time and he's had the tendency to utilize the services of his mother-in-law, the maternal grandmother, with the girls and although she may not, in the classic sense, be unfit, she isn't the ideal person to have the girls with.
The trial judge conceded that the girls "are being raised well by an intelligent mother where they have regular contact [through visitation] with their father"; and that they are being raised "in a very, very more than adequate manner." However, relying in large measure on the testimony of Dr. Greif, he concluded that "maximum meaningful living contact" with the father is in the best interests of the children and that
... a meaningful maximum contact with father is custodial time, that visitation for all its liberality is not the same thing and that it's just entertainment time.
He commented that
Not only is there no question here but Mrs. Beck has been a more than adequate mother, but it is simply that despite all that she has done, the professional conclusions [of Dr. Clark and Dr. Greif] which I adopt indicate that she is limited because she cannot be both a mother and a father.
*41 By order of July 11, 1979 the trial judge modified the custody provisions of the judgment of divorce by (1) requiring the parties and the children immediately to "partake in joint counselling at a counsellor of the parties mutual choice or in the alternative at the Clifton Mental Health Center"; (2) requiring the children to "spend three continuous weeks with plaintiff" prior to August 15, 1979 and (3) providing that "the four month period during which [the children] shall live with plaintiff shall begin on or about September 15, 1979." We stayed the "joint custody" provisions of the judgment pending this appeal.
In a letter dated August 30, 1979 to plaintiff's attorney, the Beck family's counsellor advised:
The present level of animosity existing between Mr. and Mrs. Beck and the excessive rigidity in the Beck family have successfully neutralized my efforts at helping the Beck family through this most stressful period. This animosity and rigidity, plus the shadow of the joint custody order have all helped create an atmosphere wherein I find myself unable to fulfill the mediating and intensive counseling functions requested of me.
If the hardening of the respective positions persist, I think it's fair to surmise that the Beck children will eventually be trapped even more in the spouse conflict and will suffer unfortunate consequences as a result. Also, this continuing escalation of hostility does not bode well for any type of "healthy" post-divorce arrangements.
Therefore I have no recourse but to discontinue providing services to the Beck family while the present inimical conditions endure.
On this appeal defendant contends that there is no factual or legal basis here for an "award of alternating shared custody," and that the trial judge (1) erred "in raising the issue of custody sua sponte and after the conclusion of the trial," and (2) abused his discretion (a) in not giving sufficient weight to the preferences expressed by the children, and (b) in placing "undue reliance" on the testimony of Dr. Greif and according "insufficient weight" to Dr. Goodman's testimony. She also argues that the trial judge's decision "is not consistent with, reflective of or *42 even slightly analogous to any developing body of law"; that "[p]laintiff's brief relies on facts that did not occur," and that "[a]t best, joint custody is an option to be considered only if circumstances are favorable and the parties agree." She asks that sole custody of the children be awarded to her.
From our review of the record it is apparent that from the time the trial judge first announced his decision to impose an alternating custody arrangement, plaintiff has strongly supported the plan. Accordingly, as one who sought to change the status quo and to subject the children to the new arrangement, he had, at the plenary hearing, "the burden of proving by a preponderance of the credible evidence that the potentiality for serious psychological harm accompanying or resulting from such a move will not become a reality." Sorentino v. Family & Children's Society of Elizabeth, 72 N.J. 127, 133 (1976).[6] He failed to sustain that burden. Beyond this, Dr. Goodman, in commenting on the trial judge's plan for alternating custody, testified on direct examination:
I found in examining these children that they were very healthy and psychologically intact children. I feel that they have a vulnerability as adopted children, as children who had already registered opinions to this effect, who had in fact greeted me, "Pleased to be here" and that could I do something to intercede for them, that they were very concerned about this, that they had cried about this.
I feel that this alternating custody arrangement is seen by them as traumatic, as a cause of sorrow, as an unnatural circumstance.
I feel that they are now healthy children and that it could possibly damage them. They have no place to go but down because they are doing very well now and they are very much opposed to this idea of alternating residency.
*43 The finding by the trial judge that the alternating custody arrangement which he devised would be in the best interests of the children could not reasonably have been reached on sufficient credible evidence in the record. We are "thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction ..." State v. Johnson, 42 N.J. 146, 162 (1964). Here, the two girls have, in effect, been in the sole custody of their "more than adequate" mother, being raised "in a ... very more than adequate manner" for more than four years since the father deserted. Neither party had sought the arrangement ordered by the judge. The "intelligent" mother who has "always nurtured" the children, and the children themselves, who are "sincere and honest in their beliefs," are strongly opposed to the move. Beyond this, it is clear from their testimony that neither Dr. Clark nor Dr. Greif, whose "professional conclusions" the trial judge adopted, had any experience with or exposure to the type of alternating custody arrangement ordered by the judge.
In this case, as in all causes involving the custody of a minor child, "the paramount consideration is the safety, happiness, physical, mental and moral welfare of the child." Fantony v. Fantony, 21 N.J. 525, 536 (1956). While "[n]either parent has a superior right to custody," id., the record before us clearly demonstrates that in the present circumstances the interests of the children would best be served by awarding sole custody to the mother and affording the father reasonable rights of visitation.
The trial judge should have been guided by the actual facts in the case. Instead, he envisioned a viable cooperative family group of four, each dedicated to the alternating custody concept. This simply was not the situation before him. While an alternating living arrangement may, as Dr. Goodman observed, be possible "if the parents and the children are all in favor of" it, the evidence in the record clearly supports the conclusion that such a plan, if put into effect here, would be inimical to the best *44 interests of the two girls. Thus, after observing that the divergent child-rearing practices of the parents in this case could cause the children to become insecure, depressed, manipulative, and subject to social maladjustment, Dr. Goodman testified on direct examination:
Q Doctor, how important is it in the alternating custody arrangement which the Court has ordered for the best interests of the children that the adults, the parents, cooperate with each other and have a good relationship and open lines of communication?
A It's critical.
Q Why?
A Because a joint custody arrangement carries with it the requirement for very open communication and cooperation and the lack of rancor and animosity so that the children are not subject to divided loyalties or problems in the consistency of child rearing and discipline.
And see Annotation, "Comment Note.-`Split,' `divided,' or `alternate' custody of children," 92 A.L.R.2d 695 (1963), wherein it is observed that
A frequent shifting of a child from home to home exposes it to changes of discipline and habits, and may invite lax discipline and disobedience. Stability in the human factors affecting a child's emotional life and development is essential, and it may be argued that this stability can best be attained with such an undivided custody as will prevent the child from being shunted back and forth between homes. [at 698-699].[7]
Although required to do so by N.J.S.A. 9:2-4, the trial judge did not, as previously indicated, interview the children to determine their preferences as to custody before arriving at his June 12, 1979 disposition of the matter. And, even after he did interview the two girls during the proceedings which followed the entry of the June 12 judgment, he failed to give to their *45 clear preference the "due weight" required by that statute. See Lavene v. Lavene, 148 N.J. Super. 267, 271-274 (App.Div. 1977), certif. den. 75 N.J. 28 (1977). It appears that he summarily brushed aside their wishes with the comment that "they may not fully understand" the alternating custody plan which he had imposed. But children are not pawns to be maneuvered and molded into agreement with an arbitrarily produced way of life which they strongly oppose and which neither parent had sought.
The portions of the judgment of divorce appealed from are reversed. The matter is remanded to the trial court with directions to amend the judgment to award sole custody of the children to defendant-mother, afford plaintiff-father reasonable rights of visitation, and adjust upward accordingly the amount provided for child support. We do not retain jurisdiction.
In view of our determination, we find no need to comment on any of the remaining contentions advanced by defendant.
NOTES
[1] The older child was adopted in 1968 and the younger child in 1970.
[2] It appears that plaintiff has been in the process of purchasing a home in North Caldwell.
[3] The judgment of divorce, which was filed June 13, 1979, provides, in regard to "joint custody":

... that the parties shall have joint custody of Lauren Beck and Kirsten Beck, the infant children of the marriage, and the plaintiff shall provide a home for the said children with basic clothing and other amenities, books and bedding; and the time sharing shall be based on four (4) continuous months with each parent, commencing with plaintiff as of July 1, 1979; and visitation will be with the other parent every other weekend. While one parent has summers, he or she will make provision for the other parent to have part of the summer vacation. All decisions, medical, schooling, vacations, will be a joint determination;
[4] The motion was supported by a certification by defendant. Plaintiff filed an "answering certification" to which defendant filed her "reply certification."
[5] He spent "[a]bout twenty minutes to a half an hour" with Mr. Beck and the two children together, and then saw each of the children separately for "[b]etween forty-five minutes and an hour each."
[6] Referred to as Sorentino I. The opinion of the Supreme Court on its review of the trial judge's decision on the remand of the matter is reported at 74 N.J. 313 (1977).
[7] Cf. Mayer v. Mayer, 150 N.J. Super. 556 (Ch.Div. 1977).