705 A.2d 1233

IN THE MATTER OF THE ADOPTION OF
A CHILD BY P.F.R. AND V.A.I.

Superior Court of New Jersey
Appellate Division

Argued February 3, 1998—Decided February 20, 1998.

Before Judges LONG, STERN and KLEINER.

*James W. Miskowski* and *Henry M. Price*, argued the cause for appellants P.F.R. and V.A.I. (*Macfall, Riedl & Miskowski*, and *Lowenstein, Sandler, Kohl, Fisher & Boylan*, attorneys; *Mr. Miskowski*, of counsel and on the brief; *Henry M. Price* and *Harriet Dinegar Milks*, on the brief).

*Diane K. Smith*, argued the cause for respondent R.S. (*Somerset Sussex Legal Services*, attorneys; *Ms. Smith*, on the brief).

*Cecilia M. Zalkind*, attorney for amicus curiae Association for Children of New Jersey.

*Frederick J. Magovern* (*Magovern and Sclafini*) of the New York bar, admitted pro hac vice, argued the cause for amicus curiae American Academy of Adoption Attorneys (*Cofsky & Zeid-*

*man*, and *Mr. Magovern*, attorneys; *Mr. Magovern* and *Diane Michelsen*, President, *American Academy of Adoption Attorneys*, of counsel; *Donald C. Cofsky* and *Mr. Magovern*, on the brief).

*Teri S. Appelson*, Deputy Attorney General, argued the cause for amicus curiae Division of Youth and Family Services (*Peter Verniero*, Attorney General, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel; *Ms. Appelson*, on the brief).

Amicus curiae Catholic Charities Diocese of Metuchen joins in appellant's brief.

The opinion of the court was delivered by

KLEINER, J.A.D.

Baby D was born on January 31, 1994. His natural mother Joan Todd[1] surrendered him for adoption to an approved agency, Catholic Charities Diocese of Metuchen ("Catholic Charities") on February 10, 1994. *See N.J.S.A.* 9:3–38a (defining "approved agency"). Thereafter, Baby D was placed in the home of plaintiffs, Peter Robinson and Vivian Robinson, on February 23, 1994, where he has continuously resided.

Effective April 27, 1994, adoptions in New Jersey are governed by *N.J.S.A.* 9:3–38 to –55. This appeal requires us to construe *N.J.S.A.* 9:3–46a where the natural father of a child born out of wedlock contests an adoption after the natural mother surrenders the child for adoption to an approved agency. Although there have been two reported opinions construing this statute, *In re Adoption of a Child by R.K.*, 303 *N.J.Super.* 182, 696 A.2d 116 (Ch.Div.1997), and *In re Adoption of a Child by F.O. and W.O.*, 307 *N.J.Super.* 176, 704 A.2d 604 (Ch.Div.1997), both opinions involved natural fathers who knew of their child's existence from the date of birth. Here, the natural father, Richard Sampson, in objecting to the Robinson's adoption, alleged that he first learned

---

[1] Because of the issues involved in this case, we will use fictitious names for all of the parties. *Cf. State v. Harris*, 141 *N.J.* 525, 534, 662 A.2d 333 (1995).

of the birth of his infant son on October 22, 1994. Thus, he argued that a determination of whether he "substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so," *N.J.S.A.* 9:3–46, must be based on an analysis of his conduct commencing on that date.

Plaintiffs countered that they were entitled to the statutory presumption, embodied in *N.J.S.A.* 9:3–46, that "[a] parent shall be presumed to have failed to perform the regular and expected parental functions of care and support of the child if the court finds that the situation set forth in [*N.J.S.A.* 9:3–46a(1) ] or [*N.J.S.A.* 9:3–46a(2) ] has occurred for six or more months."

The essence of plaintiffs' contention is that the statutory presumption commences at birth, here January 31, 1994, and thus plaintiffs were entitled to that presumption effective July 31, 1994. Thus, plaintiffs argue that despite Sampson's lack of knowledge of Baby D's birth, the statutory presumption entitled them to a judgment, after proof that they met all other statutory criteria for adoption. Stated differently, plaintiffs argue that ignorance of a child's existence is, by itself, insufficient to overcome the statutory presumption. Alternatively, plaintiffs contend that Sampson failed to perform the "regular and expected parental functions of care and support of the child" even after he learned of Baby D's birth.

The trial judge agreed with Sampson. The eleven-day trial focused upon the entire relationship of Sampson and Todd, exploring the veracity of Sampson's claim that he did not learn of Todd's pregnancy or of Baby D's birth until October 22, 1994, and exploring and evaluating Sampson's conduct after October 22, 1994.

At the conclusion of the trial on March 27, 1997, the judge rendered a fifty-one page oral opinion. After reviewing in meticulous detail the testimony of each witness, and then, again in meticulous detail, explaining why certain portions of the testimony were not worthy of belief and why other portions of testimony were substantially credible, the judge concluded, "Based upon

those findings, the Plaintiffs have failed to demonstrate by clear and convincing evidence that [Sampson] abandoned[2] this child within the meaning of that term within *N.J.S.A.* 9:3–46a(1)". The judge thus concluded that plaintiffs' complaint for adoption must be denied. The judge also orally concluded that visitation between Sampson and Baby D should immediately commence, and that a transition plan should be established resulting in Baby D's move from plaintiffs' home in New Jersey to Sampson's home in West Virginia.

Immediately following the judge's oral decision, plaintiffs made a motion for a stay of the order transferring the child pending appeal, a motion for a "best interests hearing,"[3] and requested the opportunity to file a motion for reconsideration. Sampson's counsel immediately contended:

> [T]he adoptive parents at this time have no legal right to restrain the child. The only person who has the right to restrain that child or to hold that child is the father.... [T]he adoptive parents have absolutely no right to a best interest hearing. They have no right to a custody hearing because the time that they have held this child is not custody, it's possession....

The judge delayed the implementation of her ruling to permit the filing of appropriate motions.

On March 31, 1997, Sampson filed a petition seeking, pursuant to *N.J.S.A.* 2A:67–13, a writ of habeas corpus demanding sole custody of Baby D. On that same day plaintiffs filed a motion for reconsideration of the judge's oral decision. Plaintiffs also filed on that day a complaint for custody.[4]

Plaintiffs' motions were heard by the court on April 4, 1997. The court entered orders on April 7, 1997, granting visitation to

---

[2] The word "abandoned" is not used in *N.J.S.A.* 9:3–46a(1). The trial judge should have concluded that plaintiffs had not proved that Sampson had forsaken his parental obligations. *See In re Adoption of Children by D.,* 61 *N.J.* 89, 94, 293 *A.*2d 171 (1972).

[3] Plaintiffs' counsel did not define the words "best interests hearing."

[4] Although plaintiffs filed a complaint for custody, they never served that complaint on Sampson and have not pursued that action.

Sampson, denying plaintiffs' motion for reconsideration, dismissing plaintiffs' count one of the adoption complaint and declaring the dismissal to be a final judgment, and denying plaintiff's application for a "best interests hearing." [5]  Thereafter, on April 22, 1997, plaintiffs sought an order from this court declaring the trial court's order final for purposes of appeal, for a stay of the transfer of Baby D, and for a stay of visitation.  On May 28, 1997, we granted plaintiffs' motion to stay the trial court's order regarding custody, denied their application to stay visitation, and accelerated the appeal.

Our standard of review is articulated in *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974):

> "[O]ur appellate function is a limited one: we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice," and the appellate court therefore ponders whether, on the contrary, there is substantial evidence in support of the trial judge's findings and conclusions.
>
> [<em>Ibid.</em> (citations omitted).]

In a non-jury case, such as here, a judgment:

> should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.... It is only upon the predicate of a determination that there has been a manifest miscarriage of justice, that corrective judicial action is warranted,
>
> [*Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 597–98, 379 *A.*2d 225 (1977).  *See Dolson v. Anastasia*, 55 *N.J.* 2, 6–8, 258 *A.*2d 706 (1969) (noting the appellate tribunal's deference to the trial judge in matters "not transmitted by the written record"); *Liqui-Box Corp. v. Estate of Elkman*, 238 *N.J.Super.* 588, 596, 570 *A.*2d 472 (App.Div.), *certif. denied*, 122 *N.J.* 142, 584 *A.*2d 214 (1990).]

We are therefore compelled, after our thorough review of the entire record, and after careful analysis of the oral arguments presented by counsel, including the amici briefs and oral arguments of amici counsel,[6] to affirm the trial judge's conclusion

---

[5] The judge did not define "best interests hearing."

[6] The Division of Youth and Family Services ("DYFS"), American Academy of Adoption Attorneys ("Adoption Attorneys"), Association for Children of New

denying plaintiffs' complaint seeking adoption of Baby D. However-
er, we conclude that the judge's decision denying plaintiffs' post-
trial motion for a hearing was error. A hearing, as envisioned in
*Sorentino v. The Family and Children's Soc'y of Elizabeth,* 72
*N.J.* 127, 367 *A.*2d 1168 (1976) (*Sorentino I* ), and as further
amplified in *Sorentino v. The Family & Children's Soc'y of
Elizabeth,* 74 *N.J.* 313, 378 *A.*2d 18 (1977) (*Sorentino II* ), was
mandatory under the facts of this case.[7] We therefore affirm in
part, reverse in part, and remand to the Family Part for further
accelerated proceedings, as discussed *infra.* We shall retain
jurisdiction and shall consider, on an accelerated basis, any appli-
cation necessitated by the decision of the Family Part at the
conclusion of the *"Sorentino*-type" hearing.

I

When Todd surrendered Baby D to Catholic Charities for
adoption, she did not reveal the identity of Baby D's biological
father.[8] Although Catholic Charities placed Baby D in the home

---

Jersey ("Association for Children") and Catholic Charities were granted permis-
sion to appear as amicus curiae. Two amici, DYFS and Adoption Attorneys,
presented oral argument.

[7] As noted in *Sorentino II,* the use of the words "best interests" was in its
"ordinary sense," *id.* at 316, 378 *A.*2d 18, and did not implicate the criteria for
an award of custody, *N.J.S.A.* 9:2–4. The purpose of the remand in *Sorentino I*
was to determine "whether transferring the custody of the child ... will raise the
probability of serious harm to the child." 72 *N.J.* at 133, 367 *A.*2d 1168. *See
Sorentino II,* 74 *N.J.* at 317, 378 *A.*2d 18.

We note, however, that *Sorentino II* was decided in 1977. Since that date,
there have been numerous decisions which consider other factors determina-
tive of the rights and obligations of parties and the rights of children who
deserve protection. Thus, the trial court on remand is mandated to consider
psychological harm as to Baby D, but the scope of the hearing shall be left to
the trial judge's discretion.

[8] *N.J.S.A.* 9:3–45d provides:

In any case where the identity of a parent cannot be determined or where
the known parent of a child is unable *or refuses* to identify the other parent,
and the court is unable from other information before the court to identify

of plaintiffs on February 23, 1994, plaintiffs' complaint seeking adoption was not filed until October 4, 1994.[9] On November 9, 1994, an order was entered scheduling the adoption hearing for December 9, 1994. The hearing was rescheduled for December 23, 1994, due to a scheduling conflict. At that hearing, the court was informed that after plaintiffs' complaint was filed, a man identifying himself as Richard Sampson and claiming to be the father of Baby D had called Catholic Charities to inquire about the child. Pursuant to *N.J.S.A.* 9:3–45, the court ordered that Sampson be given notice of the adoption proceeding. Plaintiffs' counsel directed a notice to Sampson at his residence in West Virginia that same day. On January 9, 1995, Sampson, through counsel, entered a notice of his objection to plaintiffs' adoption of Baby D.[10]

On March 31, 1995, a case management order was entered by the court ordering a paternity test to determine whether Sampson was, in fact, the biological father of Baby D. We glean from the record that either preceding the management conference or during the conference Sampson admitted that he learned of Baby D's birth on October 22, 1994, while serving a one-year prison sentence in West Virginia for assault. Sampson was released from jail in early-March 1995. Upon his release from jail, Sampson obtained employment in June 1995, and voluntarily commenced

---

the other parent, service on that parent shall be waived by the court. (emphasis added).

This statutory provision was embodied in the predecessor adoption act and remains unchanged in the present adoption statute effective April 27, 1994.

[9] As of the date of this placement, plaintiffs were not permitted to file a complaint for adoption until Baby D was in their home for a least six months. *N.J.S.A.* 9:3–47.

The statute, as amended, now provides: "In the discretion of the approved agency, a complaint may be filed prior to that time and the court may schedule a hearing to resolve all matters except finalization of the adoption. The adoption shall not be finalized under this section unless the child has been in the home of the adoptive parent for at least six months."

[10] On that same date, Todd, through counsel, also filed an objection to plaintiffs' adoption of Baby D.

forwarding support for Baby D. Plaintiffs rejected Sampson's support payments and those payments have been deposited to plaintiffs' counsel's trust account. After a lengthy discovery process, following the management order, Sampson was confirmed to be the biological father of Baby D.

On June 13, 1995, Sampson filed a motion for visitation with Baby D. Sampson's motion requested visitation in New Jersey once per month. Plaintiffs and the guardian ad litem appointed by the court to represent Baby D filed objections to this request. Plaintiffs' counsel's certification stated, in part:

> 5. Our firm has conducted a preliminary investigation with respect to the criminal background of [Mr. Sampson] and the nature of the offenses in which he has been involved. We have obtained from the Circuit Court of Ohio County, West Virginia, and attached hereto as Exhibit A, the police reports issued by the Wheeling Police Department.... This activity took place approximately one year ago and two months after the child was born and placed for adoption. These reports are self-evident and constitute *prima facie* proof that [Mr. Sampson] is a violent, abusive and dangerous person who would pose an extreme emotional and physical threat to the safety of the child. Such evidence also directly refutes his self-serving statement that he is "fit to parent".

On September 8, 1995, an order for a risk assessment for visitation was entered. The report of the Family Crisis Intervention Unit was submitted September 25, 1995, finding that Sampson "readily admits his involvement in domestic violence incidents, but he does not acknowledge the severity of the crimes. He blithely dismissed a brutal attack on another individual as a mistake and excused a stalking complaint because the charges were dismissed." The assessment concluded that if Sampson were to be granted visitation, it should be supervised. Further, the assessment found Sampson could benefit from a program to assist batterers as well as from a parenting course. Sampson's motion for visitation was denied.[11]

---

[11] Although plaintiffs filed an amended complaint for adoption and joined as party defendants Catholic Charities, Roman Catholic Diocese of Metuchen and Sister Pat Kelly, charging negligence, the negligence claim was severed from the adoption complaint. The pendency of the severed counts, however, rendered the ultimate decision of the trial court interlocutory.

On October 15, 1996, plaintiffs filed a motion for summary judgment arguing that the objection to the adoption filed by Sampson had been untimely as a matter of law. Sampson cross-moved for immediate custody on October 29, 1996. The guardian ad litem for Baby D filed her report on November 6, 1996, opining that it was in Baby D's best interests to remain in the physical custody of plaintiffs. Both motions were denied in a letter opinion dated November 15, 1996. Trial commenced November 19, 1996. As noted, the trial was held over eleven days between November 19, 1996, and January 23, 1997, with the judge rendering her oral opinion on March 27, 1997.

## II

Plaintiffs primary contention is that Sampson's objection was untimely. Baby D was born on January 31, 1994. Sampson first expressed an interest in Baby D when he telephoned Catholic Charities from jail in mid-November 1994. Thus, plaintiffs contend they were entitled to the statutory presumption of *N.J.S.A.* 9:3–46, which provides:

A person who is entitled to notice ... shall have the right to object to the adoption of his child. A judgment of adoption shall not be entered over an objection of a parent communicated to the court by personal appearance or by letter unless the court finds:

(1) that the parent has substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so, or

(2) that the parent is unable to perform the regular and expected parental functions of care and support of the child and that the parent's inability to perform those functions is unlikely to change in the immediate future.

The regular and expected functions of care and support of a child shall include the following:

(a) the maintenance of a relationship with the child such that the child perceives the person as his parent;

(b) communicating with the child or person having legal custody of the child and visiting the child unless visitation is impossible because of the parent's confinement in an institution, or unless prevented from so doing by the custodial parent or other custodian of the child or a social service agency over the birth parent's objection; or

(c) providing financial support for the child unless prevented from doing so by the custodial parent or other custodian of the child or a social service agency.

A parent shall be presumed to have failed to perform the regular and expected parental functions of care and support if the court finds that the situation set forth in paragraph (1) or (2) has occurred for six or more months.

The trial judge concluded that the operative words "although able to do so" in *N.J.S.A.* 9:3–46a(1) connote knowledge of a child's birth, and, therefore, unless a parent has actual knowledge of a child's birth, the parent cannot have "substantially failed to perform the regular and expected parental functions of care and support of the child." The trial judge equated failing to perform this obligation with abandonment.[12]

Predicated upon the trial judge's interpretation of *N.J.S.A.* 9:3–46a(1), the trial focused upon these essential issues: when Sampson actually or constructively knew that Todd was pregnant; alternatively, if Sampson did not know, either actually or constructively, that Todd was pregnant, when Sampson actually or constructively learned that Todd had given birth.

We need not recount the testimony of the numerous witnesses presented at trial. As noted, the trial judge concluded that Sampson did not actually or constructively know of Todd's pregnancy or of Baby D's birth until he was informed by Todd while he was an inmate in a West Virginia jail on October 22, 1994. The trial judge's conclusion could "reasonably have been reached on sufficient credible evidence in the record" considering "the proofs as a whole" with due regard to the opportunity of the one who heard the witnesses to judge their credibility. *State v. Johnson,* 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964).

*N.J.S.A.* 9:3–46a(1) does not expressly define the words "although able to do so." We have reviewed the legislative history of the amended Adoption Act and find that the legislative history is silent and provides no specific clue as to the Legislature's specific intent.

We discern a basis to interpret the meaning of "although able to do so" when we compare *N.J.S.A.* 9:3–46a(1) with *N.J.S.A.* 9:3–

---

12 *See supra* note 2.

46a(2). As argued by Sampson, subsection (1) deals with willful failure to maintain a parent-child relationship and looks to the conduct of a parent in terms of past conduct; subsection (2) deals with inability to maintain a parent-child relationship that is "unlikely to change in the immediate future."

It seems quite obvious that where a parent has voiced no objection to an adoption, the parent's conduct, either past or future, will not be a consideration before the court when asked to approve an agency-placed adoption. Six months from the date of placement, if the adoptive parents are otherwise deemed fit, the adoption will be approved.

Where a parent does voice an objection, either because the parent has been specifically identified at or before the date of surrender and has been notified of the adoption, or when, as in this case, the parent learns of the birth after the surrender and before the finalization of the adoption, the parent's past conduct must be scrutinized. If the parent was "unable to perform the regular and expected parental functions of care and support of the child," but that inability is likely "to change in the immediate future," the adoption must be denied. *See N.J.S.A.* 9:3–46a(2).

Both subsections (1) and (2) require an analysis of a parent's conduct. Both statutory subsections hinge on a parent's abilities: subsection (1) on past abilities; subsection (2) on future abilities "immediate[ly]" commenced.

■ Where, as here, the trial judge determines that a natural father did not know or have reason to know of the natural mother's pregnancy, and did not know or have reason to know of the birth of a child he fathered, his parenting conduct or his failure to act as a parent must be evaluated from the time he gained sufficient knowledge which would warrant that he "perform the regular and expected parental functions of care and support of the child," because it is from that point that he may be deemed to have been "able to do so." *N.J.S.A.* 9:3–46a(1).

We are aware of precedent in other jurisdictions which considers a parent's conduct prior to the birth of a child. *See Robert O.*

*v. Russell K.,* 80 *N.Y.*2d 254, 590 *N.Y.S.*2d 37, 604 *N.E.*2d 99 (1992).[13] However, the scheme of New York's adoption statute permits affirmative action by an unwed father prior to the birth of a child. But even *Robert O,* as we read that decision, is premised upon knowledge of a pregnancy. We do not reject the concept that pre-birth conduct may be utilized in scrutinizing a parent's conduct. We simply determine that it is irrelevant in those situations where, as here, the natural father is found by credible evidence in the record to not have actually or constructively known of either the pregnancy or birth of his child prior to learning of that fact before the finalization of the adoption of the child.

The decision in this case does not hinge on the constitutional rights of unwed fathers to notice. *See Lehr v. Robertson,* 463 *U.S.* 248, 103 *S.Ct.* 2985, 77 *L.Ed.*2d 614 (1983); *Caban v. Mohammed,* 441 *U.S.* 380, 99 *S.Ct.* 1760, 60 *L.Ed.*2d 297 (1979); *Quilloin v. Walcott,* 434 *U.S.* 246, 98 *S.Ct.* 549, 54 *L.Ed.*2d 511 (1978); *Stanley v. Illinois,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972). Here, Sampson obtained notice. Once his identity was known, he was given the opportunity to object, which he exercised, and presented evidence that, but for his lack of prior notice, he would have been "able" to "perform the regular and expected functions of care and support of the child." *N.J.S.A.* 9:3–46a(1).

### III

We have already noted that immediately upon hearing the trial judge's findings of fact and conclusions of law, *R.* 1:7–4, plaintiffs'

---

[13] As noted in *Robert O.:*

> Domestic Relations Law § 111–a(2) provides the father of a child born outside wedlock can qualify for notice of an adoption proceeding in any one of several ways: by having been adjudicated to be the father, by filing a timely notice of intent to claim paternity, by living openly with the mother and child and holding himself out as the father, by having been named the father in a sworn statement by the mother, by having married the mother subsequent to the birth, or by filing with the Putative Father Registry. [590 *N.Y.S.*2d at 39, 604 *N.E.*2d at 101.]

counsel orally sought a hearing to determine the "best interests" of Baby D. Plaintiffs' motion was renewed in writing three days thereafter. The trial judge erroneously denied that motion.

In *Sorentino I, supra,* in an adoption proceeding, the natural mother, then married to the natural father, sought to revoke her pre-marital surrender of a child, predicated upon her contention that her decision to surrender the child for adoption was coerced by an adoption agency. 72 *N.J.* at 128, 367 *A.*2d 1168. Despite a finding by the trial court that the mother was coerced, our Supreme Court refused to order a return of the child to the natural parents without an additional investigation to determine the best interests of the child in light of the potential psychological damage inherent in a custody change. *Id.* at 131–33, 367 *A.*2d 1168. The Court specifically recognized that a "court cannot evade its responsibility, as *parens patriae* of all minor children, to preserve them from harm," and that "[t]he possibility of serious psychological harm to the child ... transcends all other considerations." *Id.* at 132, 367 *A.*2d 1168 (citations omitted).

■ The child in *Sorentino I* was then thirty-one months of age and, as of the date of the decision, December 17, 1976, had been residing with the prospective adoptive parents since July 9, 1974. *Id.* at 128, 367 *A.*2d 1168. *See Sorentino II, supra,* 74 *N.J.* at 317, 378 *A.*2d 18. Here, Baby D has been residing in plaintiffs' home since February 23, 1994. The trial judge, who rendered her oral opinion on March 27, 1997, was compelled to abide by the dictates of *Sorentino I.*

Our Supreme Court has continued to adhere to its recognition that serious and enduring psychological harm may befall a child when separated from an alternate caretaker. *New Jersey Div. of Youth and Family Services v. A.W.,* 103 *N.J.* 591, 512 *A.*2d 438 (1986) (stating that the potential injury to a child caused by severing his or her attachment to an alternate caretaker may be considered a harm to the child which a parent is unable to eliminate). "It has been recognized that the psychological aspect of parenthood is more important in terms of development of the child and its mental and emotional health than the coincidence of

biological or natural parenthood." *Sees v. Baber,* 74 *N.J.* 201, 222, 377 *A.*2d 628 (1977). Further, the Legislature has fully recognized the prospective harm to a child when separated from an alternate caretaker. *See N.J.S.A.* 30:4C–15.1a(2); *In re Guardianship of J.C.,* 129 *N.J.* 1, 608 *A.*2d 1312 (1992); *In re Guardianship of K.L.F.,* 129 *N.J.* 32, 608 *A.*2d 1327 (1992).

Although the proceedings here were solely within the context of the Adoption Act, the effect of the trial court's decision as to plaintiffs is akin to a termination of putative parental rights and, most importantly, ignored the potential harm to Baby D. We reject Sampson's suggestion that *Sorentino I* is applicable only to contested custody cases. *Sorentino I* arose in the context of a revocation of the surrender of a child for adoption. Although the natural mother sought custody of her child who she had placed for adoption, the ultimate decision of the court, both in *Sorentino I,* and thereafter in *Sorentino II,* was an analysis steeped in precedent in cases having root under the rubric of adoption, termination of parental rights, and custody. Pervading each case is the need to address the best interests of the child. Ignoring that issue by denying plaintiffs' post-oral decision motion which sought a "best interests" hearing was plain error.

We remand to the Family Part for a hearing to be concluded by April 1, 1998, on the issue of whether transferring the custody of Baby D to his natural father will raise the probability of serious harm to Baby D. In accord with *Sorentino I, supra,* and paraphrasing the Court, 72 *N.J.* at 133, 367 *A.*2d 1168, Sampson will have the burden of proving by a preponderance of the credible evidence that the potentiality for serious psychological harm accompanying or resulting from such a move will not become a reality. The Assignment Judge of Somerset County shall immediately assign this remand hearing to another judge assigned to the Family Part.[14] To assure objectivity, the trial judge, in his or her

---

[14] This assignment in no way constitutes a reflection upon the trial judge, but is done so as to conform our decision with *Sorentino I, supra,* 72 *N.J.* at 133, 367 *A.*2d 1168.

discretion, may appoint an impartial expert witness. Pursuant to *Rule* 1:7–4, findings of fact and conclusions of law shall be rendered within one week of the conclusion of the remand proceedings. All parties shall submit and simultaneously exchange and file briefs directed to the findings of fact and conclusions of law within two weeks of the trial judge's opinion. Oral argument on the decision shall be heard in this court on May 12, 1998.

Affirmed in part, reversed and remanded in part for further proceedings consistent with this opinion. We retain jurisdiction.