918 A.2d 686 (2007)
391 N.J. Super. 453
Peter W. INNES, Plaintiff-Respondent,
v.
Maria Jose CARRASCOSA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 2007.
Decided April 3, 2007.
*691 Alan S. Lewis (Carter, Ledyard & Milburn) of the New York bar, admitted pro hac vice, argued the cause for appellant (Mark S. Carter, attorney; Mr. Carter, of counsel and on the brief; Kenneth S. Levine, New York, NY (Carter, Ledyard & Milburn) of the New York bar, admitted pro hac vice, on the brief).
Peter Van Aulen, Saddle Brook, argued the cause for respondent (Law Offices of Peter Van Aulen, attorney, Mr. Van Aulen and Laura Van Tassel, on the brief).
Before Judges STERN, COLLESTER and LYONS.
The opinion of the court was delivered by
LYONS, J.S.C. (temporarily assigned).
Every lawsuit affects some people. In this case, there are three persons who are primarily affected. The father of a six-year-old girl has not seen his daughter for over two years. The child's mother is incarcerated in New Jersey for failing to take steps to return the child from Spain. Most seriously affected, the young child of the couple, is in Spain without either her mother or her father. The genesis of this heartbreaking situation is the failure of the parties' marriage and the conflict which ensued between them. Now, following the entry of a judgment of divorce and a child custody award, we are presented with certain legal issues for resolution.
Defendant in this action is María José Carrascosa ("Carrascosa"), the mother of six-year-old Victoria Solenne ("Victoria"). Plaintiff, Peter W. Innes ("Innes"), is Victoria's father and the former husband of Carrascosa. Carrascosa appeals from a judgment awarding sole custody of Victoria to Innes, the court's order directing Carrascosa to take actions to return Victoria from Spain, sanctions imposed on her for failing to take action to return Victoria, and the trial court's denial of her motion to stay a contempt hearing.
Innes and Carrascosa were married in the Roman Catholic Church in Linola, Spain on March 20, 1999. During their marriage, the couple resided in West New York, New Jersey. Innes is a citizen and resident of the United States and is self-employed in the field of advertising. Carrascosa is a citizen of Spain who was continuously living in the United States since 1992. She is a self-employed attorney licensed in the European Union.
Approximately one week before their marriage the parties signed a pre-nuptial agreement on March 12, 1999. The terms of the agreement are primarily concerned with issues of property, support obligations, and debts. The agreement provides that it "shall be construed and interpreted under the laws of the state of New Jersey, which is the state of residence of the Parties."
On April 17, 2000, Victoria was born to the couple in Secaucus, New Jersey. She is both a citizen of the United States and of Spain. She attended parochial school in Fort Lee while she lived in New Jersey.
In early 2004, Carrascosa and Innes separated. Shortly thereafter, Carrascosa filed for an annulment with the Ecclesiastic Tribunal of the Archdiocese of Valencia, Spain, on grounds of false pretenses and deceitful fraud. Innes filed an opposition to the annulment and on May 24, 2004, the Ecclesiastic Tribunal issued a decree commencing the discovery period for marriage nullification.
*692 Through her counsel in the United States, on October 8, 2004, Carrascosa forwarded an agreement to Innes concerning parenting time, restrictions, and the appointment of a third-party parenting coordinator. According to the agreement, Innes was to have parenting time with Victoria "one evening during the week from 6 p.m. to 8 p.m." as well as weekend visits. The agreement also provided that:
[n]either Ms. Carrascosa nor Mr. Innes may travel outside of the United States with Victoria Solenne without the written permission of the other party. To that end, Victoria Solenne's United States and Spanish passport shall be held in trust by Mitchell A. Liebowitz, Esq.... Neither Ms. Carrascosa nor Mr. Innes may travel outside of a radius of 90 miles from Ft. Lee, New Jersey with Victoria Solenne without the written permission of the other party.
Finally, the agreement provided for the appointment of a parenting coordinator "to help facilitate the development of effective communication between the parties concerning Victoria Solenne." Carrascosa signed the agreement on October 8, 2004, Innes signed on October 9, 2004.
On December 10, 2004, Innes filed a complaint for divorce with the Superior Court seeking dissolution of the matrimonial bonds between the parties, equitable distribution of real and personal property acquired during the marriage, joint legal custody of Victoria and attorney fees. The complaint charged Carrascosa with extreme cruelty and financial deception during the marriage. Carrascosa accepted service of the complaint on January 5, 2005.
On December 15, 2004, Carrascosa filed an action in Spain seeking a civil annulment. Carrascosa claims that the Ecclesiastic Tribunal had annulled the marriage on November 6, 2004 but provides no documented evidence of this religious annulment. In fact, according to Carrascosa's attorney certification, the Ecclesiastic Tribunal had not yet issued an annulment as of December 15, 2004. Moreover, the attorney certification indicates that "the Nullity case was officially published in [the] Ecclesiastical Edictus since June 5th 2006." Carrascosa's attorneys certified that, as of September 26, 2006, the Spanish Royal Tribunal, the Spanish civil court, had not yet ratified any matrimonial annulment.
On December 16, 2004, Carrascosa filed criminal charges in Spain against Innes for abuse and use of multiple identities prior to the marriage.
Carrascosa and Victoria traveled to Spain without the written consent or knowledge of Innes on or about January 12, 2005. The two lived together in Spain until Carrascosa returned to the United States in the summer of 2006, leaving Victoria with her maternal grandparents in Spain. As a result of Carrascosa's incarceration here, Victoria has remained in Spain with her grandparents ever since.
On January 19, 2005, Innes applied to the Superior Court for joint custody of Victoria and for enforcement of visitation rights pursuant to the October 8, 2004 agreement. On January 28, 2005, Carrascosa filed a cross-motion to dismiss Innes' complaint for divorce for lack of jurisdiction or in the alternative, staying the pending action "until such time as the Spanish courts have rendered a decision on the three (3) actions pending there." On the same date, Carrascosa also filed a limited notice of appearance in the New Jersey divorce action filed December 10, 2004 for issues relating to jurisdiction only, stating, "[i]f New Jersey assumes jurisdiction over this matter, we reserve the right to amend this notice of appearance and file a substantive *693 answer to plaintiff's complaint for divorce."
On February 4, 2005, Judge Parsons heard Innes' motion for joint custody and enforcement of visitation and Carrascosa's cross-motion to dismiss, ordering, in relevant part:
(1) that the defendant's application for a stay of the New Jersey proceeding shall be decided after counsel for the parties and the Court engage in a conference call with the Spanish Court .. .
(3) that the minor child, Victoria Solenne Innes . . . shall be returned from Spain immediately .. .
(4) that upon the child's return from Spain, the parties shall abide by the parenting plan agreement entered into by the parties on October 8, 2004 .. . [and] that the child's passport shall be turned over to the Court upon her return to the United States.
On February 17, 2005, Carrascosa filed a motion with this court for leave to appeal from paragraphs three and four of the order entered by Judge Parsons. Leave to appeal was denied on March 11, 2005; the order of the court was filed on March 14, 2005.
On February 24, 2005, Judge Parsons unsuccessfully attempted to contact Judge Corbalan of the Spanish Court of First Instance No. 9, then the relevant civil court in Spain, by written correspondence to discuss the matrimonial annulment and schedule a phone conference. Judge Parsons had attempted on prior occasions to contact Judge Corbalan by fax and telephone to no avail.
Carrascosa next sought a stay of the New Jersey proceedings during the pendency of the Spanish legal proceedings. On March 22, 2005, a motion for custody hearing and a telephone conference were held between counsel for all parties, including counsel from Spain, before Judge Parsons. At the hearing, Judge Parsons indicated that his review of the facts and his conversation with the Spanish attorneys led him to believe that "Spain does not have the requisite jurisdiction over the parties ... New Jersey certainly has a more substantial interest in this matter than Spain . . . The only nexus I see with Spain is that defendant is a Spanish national and they got married in Spain." The court also noted that "I think that [Carrascosa] has engaged in forum shopping."
Consequently, Judge Parsons entered an order, denying Carrascosa's application for a stay of the New Jersey proceedings, granted Innes temporary custody of Victoria and ordered that she be "returned from Spain within three weeks of the date of the entry of this Order." The order also stated that if Carrascosa did not return the child as provided, an arrest warrant would automatically issue. Additionally, the court directed the surrender of Victoria's passports upon the return of the child to New Jersey and scheduled a status conference for April 12, 2005.
On April 11, 2005, Carrascosa filed a motion with the trial court for reconsideration of the court's March 22, 2005 order denying a stay of the New Jersey proceedings. In her motion, Carrascosa argued that the court's order was entered prematurely, without consideration of the pending Spanish litigation. Carrascosa also submitted that the court's order requiring the return of Victoria was based upon improper representations of Spanish law and procedure and contrary to the Hague Convention.
Following the scheduled status conference on April 12, 2005, at which she did not personally appear, Judge Parsons entered an order compelling Carrascosa to substantiate her representations by April *694 20, 2005 that she was detained in Spain and not permitted to leave the country or a warrant would be automatically issued for her arrest. Carrascosa failed to substantiate her claims and Judge Parsons issued an arrest warrant on April 20, 2005.
On April 29, 2005, Innes executed an "Application for Assistance Under the Hague Convention on International Child Abduction" with the United States Department of State, Office of Children's Affairs. In the application, Innes stated, "January 2005 Victoria was removed from the USA in direct violation of a duly executed parenting agreement" and cited the "US Court order demanding the immediate return of Victoria to the United States" as legal grounds for his claim.
On May 13, 2005, the trial court considered and denied Carrascosa's April 11, 2005 application for reconsideration of the March 22, 2005 order and imposed daily monetary sanctions of $100 upon appellant. The order by Judge Parsons also prohibited Carrascosa from "transferring, selling, liquidating or otherwise disposing of any of her assets until completion of the within action."
Based upon a complaint filed by Innes, on June 10, 2005, Saddle Brook Township Municipal Court issued a criminal summons against Carrascosa for:
Commit[ting] interference with custody by detaining and concealing Victoria Innes, a minor child, from Peter Innes, the child's father, after issuance of an order specifying custody rights, in violation of that order, specifically by not returning Victoria Innes as stated in the court order issued on March 22, 2005 by Hon. George W. Parsons, J.S.C. in violation of N.J.S.A. 2C:13-4a.
Carrascosa was ordered to appear before said Municipal Court on June 22, 2005. She was notified of her rights and arraigned in absentia on June 29, 2005.
On June 14, 2005, Innes filed an application with the Valencia court for the return of Victoria to her New Jersey residence under the Hague International Child Abduction Convention, 51 Fed.Reg. 10,498 (March 26, 1986)("Hague Convention" or "Convention"), its Federal implementing statute, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 to -11611 (1988), and the New Jersey court order. Innes also requested an order from the Spanish Court of First Instance No. 9 that Victoria not be permitted to leave Spain for fear that she would be taken to a third country. Consequently, on June 24, 2005, the Court of First Instance No. 9 issued an order prohibiting Victoria from leaving Spain. The order is effective on June 18, 2005 and ends on April 17, 2018, Victoria's eighteenth birthday.
As part of the Hague application, the court in Spain ordered Carrascosa and Victoria to undergo a psychological evaluation. Consequently, on June 24, 2005, five-year-old Victoria was examined by Ángel Manuel Turbi Pinazo, a psychologist on the Psychosocial Team assigned to the Family Court of Valencia. In addition to information available in court orders, the examination included an "individual semi-structured interview with the child . . . [a] Bender Visual Motor Gestalt Test . . . [a] Family Drawing Test ... [and an] Animal Drawing Test." Following examination, the psychologist found:
emotional instability in the child . . . clear evidence of the child's having been manipulated by her mother by means of attitudes and utterances, in order to create a negative image of her father, thereby favouring a rejection towards him . . . [and] no evidence to point to any serious physical risk to the child if she were returned.
*695 The psychologist also reported, "we do not think that maintaining a relationship with both parents would lead to any serious psycho-emotional imbalance . . . [m]aintaining the child's place of abode in our country would mean a cessation of the father-child relationship . . . entail[ing] risk to the child's psycho-emotional development." Accordingly, it was concluded "to be in the child's interest to maintain a relationship with both parents."
On July 6, 2005, the Spanish Court of First Instance No. 9 rejected Innes' Hague petition. In its decision, the court noted that the Hague Convention's objective was "guaranteeing the immediate restitution of minor children wrongfully transferred to or retained in any contracting State . . ." After its examination of the Convention, the court concluded that Victoria's transfer to Spain was not wrongful since Innes did not have custody over the child. Specifically, the court held that when Carrascosa took Victoria to Spain in January 2005, Innes had not been granted any form of custody. Moreover, the court reasoned that the October 8, 2004 parenting agreement made Carrascosa the custodial parent and her violation of it did not void it. The court concluded, "there is no place to order the restitution of Victoria Solenne Innes to the United States and her delivery to her father Peter William Innes." Innes appealed this denial and the court's implicit grant of temporary custody to Carrascosa. This appeal was heard by the Provincial Court of Valencia, Section 10 on January 17, 2006.
On or about October 12, 2005, Carrascosa filed a motion to dismiss the pending New Jersey matrimonial matter and all outstanding orders. In her motion, Carrascosa claimed:
all ties in this matter are directly linked to Spain: our marriage, [Innes'] willing participation in the [Spanish] litigations, and the Plaintiff having filed affirmative claims in the Spanish Court .... [p]laintiff is now attempting to forum shop for his own convenience, without legal basis or merit, knowing full well that Bergen County, New Jersey is not the appropriate venue for this matrimonial dispute, particularly where a trial on all issues has already been completed in Spain.
In support of her motion, Carrascosa certified to the Superior Court that the Spanish Court of First Instance No. 9 had already held a trial regarding the validity of the marriage and that a decision was expected in the near future concerning the marriage validity, child custody, and termination of Innes' parental rights. Carrascosa also pointed out that the Spanish court found no kidnapping occurred when she took Victoria to Spain. Consequently, "no purpose can be served by the continuation of the New Jersey litigation."
Carrascosa's motion to dismiss was considered by Judge Edward V. Torack, who replaced Judge Parsons in the case before the Superior Court. Judge Torack issued an order on November 4, 2005 dismissing Innes' complaint for custody, parenting time, and child support and vacating "all prior orders relating to custody, parenting time, child support and for the arrest of [Carrascosa]." The court, however, retained "jurisdiction of property rights and financial issues in this matter in the event that the Spanish Court grants wife an annulment" and reserved the right "to submit a more detailed letter to the Appellate Division in the event of an appeal."
On November 11, 2005, the Spanish Court of First Instance No. 9 considered whether it had jurisdiction to determine questions concerning the annulment. The court held:
whereas [Innes] is a U.S. national, whereas the last habitual residence of the spouses was in the USA, and where *696 as both spouses habitually resided in the USA and, specifically, during 2004, this Court must determine ex officio its lack of international jurisdiction and must refrain from continuing to deal with the petition under question (pursuant to Article 38 of the Civil Procedure Act), notwithstanding any action that may be lodged, if applicable, before the U.S. Courts.
The Spanish court decided, therefore, that it would "refrain due to its lack of international jurisdiction, from dealing with the petition for matrimonial annulment lodged by [Carrascosa] against [Innes]." Carrascosa appealed this decision to the Spanish Provincial Court of Valencia, Section 10, which was heard on June 29, 2006.
While the appeal was pending, based upon the determinations of the Spanish Court of First Instance No. 9, on December 9, 2005, Judge Torack reinstated all prior Superior Court orders "with the exception of the order for wife's arrest" and ordered that Carrascosa "be permitted to leave Spain with the parties' child and not be arraigned." The court also ordered, however, that the arrest warrant "shall remain vacated and will be reinstated upon 2 days notice to counsel if the parties' child is not returned as ordered on December 22, 2005 by 5pm." The order also held that upon Victoria's return to New Jersey, her passports were to be held in escrow by Innes' counsel. It further provided that Carrascosa would be barred "from leaving New Jersey" and compelled her to "participate in the court-ordered custody evaluation." Judge Torack's order also provided for daily monetary sanctions of $500 in the event of Carrascosa's non-compliance, and for visitation time with the child.
On December 22, 2005, Judge Torack reinstated all prior orders except the warrant for arrest and imposed the daily monetary sanctions. Carrascosa claimed that she had medical troubles that prevented her from complying with the court order.
On January 17, 2006, however, the Spanish Provincial Court, Section 10 considered the July 6, 2005 Hague determination of the Spanish Court of First Instance No. 9. The Provincial Court applied Spanish law and affirmed, holding that:
[t]he agreement signed between the parties dated 8 October 2004 in which some personal affairs were determined regarding their separation . . . does not expressly specify that the guardianship and custody of the minor is attributed to the mother, however, this assignment of custody [to Carrascosa] is indeed implicitly stated in this document . . .
The Provincial Court also noted that the "assignment of maternal custody is a fact that is not even disputed by the parties" and that the October agreement only gave Innes visitation rights. The court then examined Article Five of the Hague Convention, and held:
[t]he care of the child was exercised by her mother [Carrascosa] and the right to decide on her residence was shared between both parents in the [October 8, 2004 agreement] ... when, on about 12 January 2005, the mother brought her daughter to Spain, she breached this agreement. However, in Spain such agreement could only be considered as a letter of intent[,] therefore[,] no sanction whatsoever could be imposed for such breach of contract, as it was an agreement limiting the fundamental rights contained in Article 19 of the Constitution that guarantees all Spanish citizens the right to freely choose their place of residence and the use of such expression in the agreement can not be deemed valid. The incompatibility of this restrictive clause with Spanish law regarding fundamental rights . . . is justification *697 for a refusal to return the child, as has been requested.
The Provincial Court concluded, therefore, that Victoria was never abducted by her mother under the Hague Convention, dismissed Innes' appeal, and reinstated the July 6, 2005 determination of the Spanish Court No. 9.
On February 1, 2006, Judge Torack executed an order scheduling a trial date of April 3, 2006 in the Superior Court divorce matter. The order also required Carrascosa to submit, on a biweekly basis to the court and to Innes' counsel, updated medical reports "regarding her medical condition and her ability to travel to New Jersey for trial." The order also compelled Carrascosa and Innes to secure the release of Victoria's passports from the Spanish court and that they be held by Innes' counsel. Moreover, the court provided that the parties "shall cooperate with a custody parenting evaluation by the Bergen Family Center" and stated that if Carrascosa failed to cooperate with such evaluation or the "immediate return of the child to New Jersey, the Court will suppress her pleadings and defenses at trial." Innes was also given daily telephone contact with Victoria.
Pursuant to this order, Innes reported for the custody evaluation. Despite being permitted by the court to conduct the custody evaluation by video conferencing, Carrascosa failed to report on the scheduled date and was never interviewed by the Bergen Family Center.
Trial in the Superior Court divorce action was held on April 5, 2006 before Judge Torack. On this date, opening statements were given and oral argument predominantly concerned the status of the actions in New Jersey and Spain. Counsel for Innes informed the court that criminal proceedings filed by Carrascosa in Spain were dismissed. Counsel for Innes also informed the trial court that criminal proceedings in Bergen County filed against Carrascosa for interference of custody and contempt of court were still pending. The trial court was also informed that litigation pending the annulment of the marriage was still ongoing in Spain. Judge Torack then scheduled trial for April 24, 2006 and ordered Carrascosa to permit daily phone contact between Innes and Victoria.
On April 24, 2006, the trial court conducted a case management conference wherein it adjourned the trial to August 16, 2006. An order was also entered giving Innes "uninterrupted, continuous and exclusive parenting time with the parties' child, Victoria, in Spain beginning June 15, 2006 and continuing through June 30, 2006." The parties were to exchange information by May 31, 2006. Carrascosa, however, did not cooperate in arranging parenting time and as a result, Innes filed an affidavit of non-compliance on June 12, 2006.
On June 29, 2006, the Spanish Provincial Court of Valencia, Section 10, considered the appeal filed by Carrascosa concerning the jurisdiction of the Spanish courts to resolve annulment issues. The Provincial Court reversed the Court of First Instance No. 9, finding:
the courts of Spain have competence to know this process, Spain being a country with which the process has a deep connection, based on elements such as the nationality of the plaintiff, her present residence and her daughter's residence, and it is the place where the marriage of the litigants took place (page 16); therefore, the appeal must be allowed.
Consequently, the Provincial Court "discharg[ed] the said writ in order to declare .. . the competence to know this process corresponds to the Spanish Courts." *698
On or about June 30, 2006, counsel for Carrascosa filed a motion to be relieved as her attorneys in New Jersey. Judge Torack issued an order relieving counsel and Carrascosa thus became self-represented. By August 2006, Carrascosa was represented by new counsel. On this date, Judge Torack also ordered that the proof hearing scheduled for July 10, 2006 was rescheduled to the trial date of August 16, 2006 and would occur on that date if Carrascosa was found not to be in compliance with the court's case management conference order of April 24, 2006.
Trial in the Superior Court divorce action was held before Judge Torack on August 16, 2006, August 17, 2006 and August 22, 2006.
At trial on August 16, 2006, Innes, Carrascosa and their respective counsel were present. Before hearing testimony, the court considered an application made by Carrascosa's new counsel for an adjournment of the trial on the ground that he needed time to familiarize himself with this "voluminous case" and because "parallel proceedings" were still ongoing in Spain. The court rejected counsel's request, stating that Carrascosa "has had over 600 days to prepare this case for trial. She chose to fire her attorney ... [s]he was told months ago that the case would not be adjourned and that she would have to proceed pro se." Moreover, the court held that an adjournment of the trial would "further destroy the relationship of father and daughter" because Carrascosa will not permit Innes to see his child. Consequently, the trial proceeded as scheduled and Innes was called to testify.
At trial, Innes testified that throughout the course of the marriage, caring for Victoria was a "shared responsibility ... [Innes] cared for her in the evenings while [Carrascosa] typically would work on her at-home business." Innes testified that after separation from Carrascosa, his daily visitations with Victoria "slowly started to diminish as [Carrascosa] started to restrict [his] visitation." Innes also provided testimony that the last time he visited with his daughter was on November 4, 2004 and that he only found out on February 4, 2005 that his daughter had been taken by Carrascosa to Spain. Consequently, Innes sought contact with Victoria and on February 1, 2006, pursuant to Judge Torack's order, began to call Victoria every day in Spain for approximately five months. Innes informed the court that despite his attempts to contact his daughter, he was unable to speak with her once, and that he stopped phoning her when he was served with a temporary restraining order.
Innes testified that he had a strong relationship with his daughter:
We did everything together. We would watch videos. We would go shopping. We'd go for walks. We'd go down to, you know, the park and look at ducks. We did exactly what a father and a four year old daughter would do. And we did it on a daily basis.
Moreover, Innes expressed that he wanted his "child to have her mother and father in her life" but believed that Carrascosa was an unfit mother, "[t]he emotional harm that she's causing my daughter by terminating the relationship that my daughter has with me, her biological and only father. That's not, in my opinion, an action of a fit mother."
On the second day of trial, August, 17, 2006, Innes again took the stand and testified that he was interested only in retrieving his child back from Spain and was not interested in sanctions or other relief against Carrascosa. Innes gave testimony that he sought the incarceration of Carrascosa because she "demonstrated a long history of failure to comply with any order this Court issue[d]" and that unless such *699 "decisive action" was taken, he would never see his child again. When questioned why he did not choose to pursue his rights to Victoria exclusively in Spain, Innes stated:
. . . I'm a U.S. citizen. My daughter is a U.S. Citizen. She's a resident of New Jersey. I don't read, write, or speak Spanish. It's an enormous expense. So there's no way I could have defended anything in Spain. Nor is there any reason why I would want to.
On August 22, 2006, the final day of trial, counsel for Carrascosa informed the court that his client would not be testifying. Counsel had recently discovered that his client had been arraigned in absentia by the Saddle Brook Municipal Court in June 2005 for interference with custody and concealing a minor, and that charges were pending with the Bergen County Prosecutor's Office. Counsel also learned from Innes' counsel that a Bergen County assistant prosecutor was present in the courtroom and that the prosecutor would possibly pursue a criminal action against Carrascosa. Accordingly, Carrascosa was advised by her counsel not to testify and invoked her Fifth Amendment rights. The parties proceeded to summations.
During summation, Carrascosa urged the court to dismiss the divorce action against her on a number of grounds. First, Carrascosa argued that the Spanish Provincial Court had twice ruled that no abduction took place and that Carrascosa was not guilty of wrongdoing. Therefore under res judicata and comity principles, the Superior Court action should be dismissed. Moreover, Carrascosa argued that the Spanish courts have proper jurisdiction in this matter as they recognized an "intense connection" to this case. Carrascosa also submitted that Innes recognized the Spanish court's jurisdiction by participating in the actions abroad, and that he could have chosen to pursue relief in Spain. Carrascosa additionally urged against the application of sanctions in this case; her counsel stated that she was unable to comply with the orders of the Superior Court to return the child to New Jersey because Victoria's passports had been surrendered to the Spanish courts and because Carrascosa had health problems requiring medical care in Spain.
Innes stated during summation that Carrascosa's actions throughout the course of the litigation, particularly her failure to permit phone calls with Victoria, demonstrate that she wants to cut him off from communicating with his daughter. Moreover, Innes urged the court that comity is a discretionary doctrine, and deference to a foreign court need not be given if it would not be in the best interests of the child.
Following summations, the court rendered its decision, finding that "the Court has jurisdiction over the parties and the cause of action for divorce is properly laid in Bergen County . . . . New Jersey was the residence of the parties at the time of the filing of the divorce complaint." The court found that Innes had proper grounds for divorce pursuant to N.J.S.A. 2A:34-2(d), that is, the couple's separation in excess of eighteen consecutive months.
The court then examined the issue of custody under the Hague Convention, noting:
Under the Hague Convention, the Court conducting a Hague Convention proceeding does not award custody, and that's exactly what happened here. There is no outstanding order to this date by any [Spanish] Court on the issue of custody. This is no order which would be granted recognition under comity or any other doctrine; it just doesn't exist. There is no order that this court is obligated to recognize because *700 there is no order for custody by any Spanish Court to date.
Finding that New Jersey has "home state jurisdiction and should exercise its jurisdiction in the best interest of the child," custody was next analyzed under the statutes of New Jersey. The court first determined that under N.J.S.A. 9:2-1 to -21, "a party cannot remove a minor child without Court order or without consent of the other party ... [i]n this case, it was done by the wife and it was not only done in violation of our case law and the statutory law but also [in] violation of the agreement between the parties."
The court then examined the various factors of N.J.S.A. 9:2-4C to determine how custody should be awarded.[1] The court noted that Carrascosa has refused to cooperate with Innes and the court orders, harmed the child by keeping her from her father, and found that Carrascosa "is unfit to act as a residential caretaker." Consequently, the court granted three orders of final judgment of divorce on August 23, August 24, and August 30, 2006, respectively.
The August 23, 2006 order dissolved the marriage between Innes and Carrascosa. The order stated that the trial court has jurisdictional authority over Carrascosa and "subject matter jurisdiction over the marital res and custody issues predicated upon the child's homestate" based upon Carrascosa's New Jersey residence and the personal service of the pleadings upon Carrascosa in New Jersey. The court also reflected its finding that "New Jersey has continuing exclusive jurisdiction over custody, parenting time, and child support issues under N.J.S.A. 2A:34-66."
Following its findings on the issues of jurisdiction, the court awarded Innes sole legal and residential custody of the minor child "predicated on the Court's analysis of the custody factors under N.J.S.A. 9:2-4." The August 24, 2006 order also compelled Carrascosa to return the child to Innes' residence in New Jersey within ten (10) days of August 22, 2006 and required her to "direct her attorney in Spain to apply to the [Spanish] courts for the return of Victoria's Spanish and United States passports and facilitate the return of said child to New Jersey." The order provided that Victoria's passports "shall be delivered to [Innes] with the child within ten (10) days of August 22, 2006."
In its August 24, 2006 order, the court also limited Carrascosa's ability to travel, ordering that "[t]he Court shall retain [Carrascosa's] passport and ... [restrained her] from leaving the State of New Jersey until Victoria Innes is returned to [Innes]." The Court then outlined consequences should the child not be returned as well as the procedures to be taken upon her arrival to the United States:
8. FURTHER ORDERED THAT: If [Carrascosa] fails to return Victoria Innes to [Innes] within ten (10) days of August 22, 2006, an order for commitment and a warrant for her arrest will immediately be issued and she shall remain in the Bergen County Jail until *701 Victoria Innes is returned to [Innes]; and it is;
9. FURTHER ORDERED THAT: Upon the return of Victoria Innes, [Carrascosa] shall have reasonable and liberal supervised parenting time with Victoria Innes through the Bergen Family Center until she receives a full medical and psychological evaluation through the Bergen Family Center, and it is;
10. FURTHER ORDERED THAT: Upon the return of the minor child to New Jersey, [Carrascosa] be and hereby is restrained from removing [Innes] from the State of New Jersey, and it is;
11. FURTHER ORDERED THAT: [Carrascosa] is restrained from continuing all civil matrimonial litigation involving divorce, custody, parenting time, child support, etc., pertaining to this marriage in Spain, and it is;
12. FURTHER ORDERED THAT: [Carrascosa] immediately file a dismissal of all pending civil litigation in Spain pertaining to the marriage.
The Court also imposed a "lien in the amount of $148,000 in favor of [Innes], representing sanctions previously Ordered by [the] Court" against Carrascosa's real estate holdings in New Jersey, staying its execution of the lien pending the return of Victoria to New Jersey. The August 24, 2006 order also provided as follows:
14. FURTHER ORDERED THAT: If [Carrascosa] does not return Victoria Innes to the State of New Jersey within ten (10) days of August 22, 2006 [Innes] may execute on said lien(s), and it is;
15. FURTHER ORDERED THAT: [Carrascosa] is restrained from applying for a passport for herself and Victoria Innes from any jurisdiction.
The court then concluded that Innes' application for attorney's fees would be decided on the papers and retained the right to issue an amplification opinion under the court rules. Finally, the court's order of August 24, 2006 required a copy of the judgment to be served, upon "[Carrascosa's] attorney, attorneys for all parties in Spain, and the Court of First Instance No. 9, Valencia, Spain, the U.S. Department of State, Immigration and Naturalization Service, and all local State and Federal law enforcement agencies . . ." The court's order of August 30, 2006 was a corrected judgment of divorce which removed an improper designation of counsel.
There having been no efforts made by Carrascosa to dismiss the civil actions in Spain and neither the child nor her passports having been returned contrary to the second amended judgment of divorce, Judge Torack issued a warrant for Carrascosa's arrest and an order for commitment on September 1, 2006, effective September 2, 2006 at 9:00 A.M., "until Victoria Innes and her passport are returned to [Innes]."
On September 15, 2006, Innes filed a motion with the Spanish Court of First Instance No. 9 to set aside the order prohibiting Victoria from leaving Spain before she reaches the age of eighteen. The Spanish court denied this motion and refused to release the child's passports, claiming they were necessary for the ongoing proceedings in Spain.
On November 3, 2006, the trial court heard oral argument on a motion brought by Carrascosa on September 3, 2006, requesting "a stay of the judgment or alternatively, for bail pending appeal, and for reconsideration to vacate the judgment and the warrant for arrest." With regard to reconsideration of its judgment, the court held:
the doctrine of international comity prevails if a foreign judgment does not prejudice the rights of U.S. citizens or violate domestic public policy . . . . [b]ecause father's rights were prejudiced *702 and New Jersey law was violated this court cannot recognize the Hague Convention decision [of the Spanish court].
With regard to the issuance of a stay, the court rejected Carrascosa's request for relief in that a showing of irreparable harm was not made. Moreover, the court noted, "further delay will cause further irreparable harm to this child." The court submitted a written supplement of opinion clarifying its decision on December 22, 2006 when its decision was appealed.
In its written opinion, the court noted that "a decision under the Hague Convention, [specifically Article 19], does not determine custody on the merits but rather seeks to return the child to the state of habitual residence where that determination can be best made." The court then explained that the child's habitual residence was New Jersey, both under state law and by operation of the October 8, 2004 agreement:
In addition to setting up parenting time for father, the agreement evidenced control by both parents over where the child would live in that each promised the other that the child would not be moved within 90 miles of New Jersey without the consent of the other. This agreement had legal effect in the State of habitual residence and thus established father's rights of custody within the meaning of the Convention . . . rights of custody and the exercise thereof were clearly evidenced by the parties' agreement.
Additionally, the court expressed its disagreement with the Spanish court's determination of Innes' custody rights:
[t]he [Spanish] court determined that father had no rights of custody because at the time of removal there had been no judicial ruling. Yet father's rights of custody were in full effect by virtue of operation of law and as evidenced by the parties' agreement. Therefore . . . I could not recognize the [Spanish] Court's determination.
Consequently, finding that "the foreign judgment prejudiced the rights of Mr. Innes and in so doing offended New Jersey's policy and laws of both parents enjoying joint custody until a decree says otherwise," the court issued an order on that date denying Carrascosa's application.
Following the civil court proceedings, the Bergen County Prosecutor's Office brought charges against Carrascosa for violation of the court orders and interference with child custody, among other charges. On November 31, 2006, Carrascosa was arrested in New York City and was incarcerated at Rikers Island, New York. Carrascosa then waived extradition and voluntarily returned to New Jersey where she is incarcerated at the Bergen County jail.
On December 1, 2006, Carrascosa filed a Notice of Appeal with this court of the August 24, 2006 and November 3, 2006 orders.
On December 15, 2006, Judge Torack ordered Carrascosa to remain incarcerated pursuant to R. 1:10-3 until she complies with the prior orders directing the return of her daughter to New Jersey and ordering her to dismiss all pending civil litigation in Spain pertaining to the marriage.
Carrascosa was indicted on December 19, 2006 by a grand jury in Bergen County. The indictment charged Carrascosa with eight counts of interference with custody in the second degree contrary to N.J.S.A. 2C:13-4a(1), 2C:13-4a(2) and 2C:13-4a(4), and one count of contempt in the fourth degree contrary to N.J.S.A. 2C:29-9a.
On December 21, 2006, Carrascosa filed an application for emergent relief with this court, seeking an immediate stay of the *703 orders mandating her custody. On December 22, 2006, Carrascosa made an application for release on her own recognizance or on reasonable bail to the Bergen County Superior Court in the criminal matter. Judge Donald Venezia set bail at one million dollars. She filed an amended motion for emergent relief and supporting papers with this court seeking release from jail on December 27, 2006, and on December 29, 2006, this court denied the emergent motions, but set an expedited schedule for the instant appeal. On January 16, 2007, bail was reduced to five-hundred thousand dollars.
On or about February 8, 2007, the United States District Court, District of New Jersey, denied a petition for a Writ of Habeas Corpus made by Carrascosa in January 2007, pursuant to 28 U.S.C. § 2254(b)(1), through which she sought to end and enjoin her detention.
Carrascosa raises the following points on appeal:
POINT I
THE NEW JERSEY COURT DID NOT HAVE JURISDICTION TO COMMAND THE RETURN OF THE CHILD FROM SPAIN TO NEW JERSEY BECAUSE A TREATY AND ITS FEDERAL IMPLEMENTING LEGISLATION LEAVE THAT DETERMINATION TO THE SOLE DISCRETION OF THE SPANISH COURT
A. The Hague Treaty
B. The Spanish Court Properly Determined that Spain Has Jurisdiction over Custody in Light of the Result in the Hague Proceedings
C. While a Hague Proceeding Does Not Determine Custody, the Spanish Court's Decision Not to Return the Child to the United States under the Hague Treaty Divested New Jersey of Jurisdiction to Adjudicate Custody
D. As a Matter of International Comity, the Trial Court Was Obligated to Honor the Spanish Court Decisions With Respect to Victoria Remaining in Spain and Spanish Rulings Relating to Custody
E. The New Jersey Court's Decision Cannot be Reconciled With a Determination of the United States Court of Appeals
F. Even Putting the Hague Treaty Aside, Application of New Jersey Law Required the Trial Court to Defer to the Spanish Custody Determination
POINT II
THE TRIAL COURT'S AWARD OF SOLE CUSTODY TO INNES AND THE PROCEDURE BY WHICH THE DECISION WAS MADE WERE CONTRARY TO NEW JERSEY LAW
A. The Best Interests of the Child Standard
B. The Trial Court Failed to Conduct a Custody Proceeding Under the Best Interests of the Child Standard
C. The Trial Court's Restrictions on Carrascosa's Testimony Constituted a Violation of Due Process
D. The Trial Court's Custody Award Impermissibly Blended Carrascosa's Punishment for Her Alleged Contempt of Court With the Custody Determination
E. The Court Should Remand this Case to a Different Family Court Judge to Avoid the Appearance of Bias
POINT III
THE TRIAL COURT'S DECISION TO "FINE" CARRASCOSA FOR "CONTEMPT" MUST BE OVERTURNED

*704 POINT IV

THE TRIAL COURT WRONGLY DENIED CARRASCOSA'S MOTION TO STAY THE CONTEMPT PROCEEDING AND FAILED TO PROTECT CARRASCOSA'S FIFTH AMENDMENT RIGHTS
Within Carrascosa's points of appeal, there are significant legal issues which must be considered. Accordingly, we will address Carrascosa's points, not as phrased in her brief, but as set forth below.

I.
The first question that must be decided is whether, under New Jersey law, the Superior Court had jurisdiction to consider the divorce and custody issues presented in this case as of December 10, 2004, the date the complaint was filed.
With regard to jurisdiction over the divorce action, N.J.S.A. 2A:34-8 states:
The Superior Court shall have jurisdiction of all causes of divorce . . . when either party is a bona fide resident of this State. The Superior Court shall have jurisdiction of an action for alimony and maintenance when the defendant is subject to the personal jurisdiction of the court, is a resident of this State, or has tangible or intangible real or personal property within the jurisdiction of the court . . .
N.J.S.A. 2A:34-10 similarly holds that jurisdiction over divorce matters is acquired when a defendant is served under the court rules and:
1. When, at the time the cause of action arose, either party was a bona fide resident of this State, and has continued so to be down to the time of the commencement of the action . . .; or
2. When, since the cause of the action arose, either party has become and for at least [one] year next preceding the commencement of the action has continued to be, a bona fide resident of this State.
"[T]he words `bona fide resident' are synonymous with `domiciliary' and mean that plaintiff or defendant must be actually domiciled within New Jersey." Gosschalk v. Gosschalk, 48 N.J.Super. 566, 572, 138 A.2d 774 (App.Div.), certif. granted, 26 N.J. 503, 140 A.2d 559, aff'd, 28 N.J. 73, 145 A.2d 327 (1958).
In this case, both Innes and Carrascosa were bona fide residents of New Jersey at the time the divorce action was filed. Innes continues to be a bona fide resident of the state. Carrascosa was personally served in New Jersey with a summons and complaint. Moreover, Carrascosa holds real property in the state. It follows, therefore, that the Superior Court had jurisdiction over the divorce action.
The New Jersey court also had subject matter jurisdiction over the custody dispute under the Uniform Child Custody Jurisdiction Act, N.J.S.A. 2A:34-28 to -52, which was in effect at the time the complaint was filed. N.J.S.A. 2A:34-31 provides that the courts of this state have jurisdiction to make a child custody determination if New Jersey is the "home state" of the child at the commencement of the proceeding, or was the home state within six months before the proceeding's commencement and the child is now absent from the state but "a parent or person acting as a parent continues to live in this State." N.J.S.A. 2A:34-30(e) defines "home state" as "the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as parent, for at least six consecutive months . . ." The Supreme Court has defined "State" to include foreign countries, thus rendering these provisions applicable to international custody *705 disputes. Ivaldi v. Ivaldi, 147 N.J. 190, 203, 685 A.2d 1319 (1996).
In this case, the six-month requirement is satisfied and neither party disputes the fact that Victoria lived in New Jersey for a period of over six-months before the commencement of this action. Nor is there a dispute that the child lived with her parents during this time. Accordingly, under the Act, as the child's home state was New Jersey, the courts of this state had jurisdiction to consider and determine custody.

II.
Carrascosa argues that the Hague Convention determines which court decides custody. She claims that the Spanish courts, in analyzing the Convention, concluded that the child was not wrongfully taken by her, since it found she had legal custody and that Innes did not. Carrascosa also asserts that since New Jersey is subject to the Convention, our courts must recognize the determinations of the Spanish courts both as to their determination on the Hague application and the Spanish courts' jurisdiction to ultimately decide custody in the Spanish civil matrimonial action. We disagree on several grounds.

A.
The first ground upon which we find disagreement with Carrascosa is her assertion that the Convention permits a court hearing a Hague application to decide custody. A review of the Convention and related law reveals that it only determines the habitual residence of the child, not the right to custody. Thus, as the forum hearing the Hague application, it was not within the province of the Spanish court to determine issues of custody, but rather, the child's habitual residence.
While the Convention concerns parental control over children, "[i]t does not seek to settle disputes about legal custody rights, nor does it depend upon the existence of court orders as a condition for returning children." Hague Convention, App. A. The Convention is a "`starting point when a child is believed to have been illegally removed to, or is being illegally retained in another country.'" Roszkowski v. Roszkowska, 274 N.J.Super. 620, 631, 644 A.2d 1150 (Ch.Div.1993) (quoting Warren Cole, Border Crossing, A.B.A.J., 90 (July 1993)). It "does not allow the state to which a child has been wrongfully taken actually to decide who should have custody." In re App. of Adan, 437 F.3d 381, 391 (3d Cir.2006). Instead, the Convention is "designed to secure the prompt return of children who have been abducted from their country of habitual residence or wrongfully retained outside that country." Hague Convention, App. A.
Once it is determined under the Hague Convention, that a particular country is a child's habitual residence and the child should be returned there, "a custody determination is left to the law of the state to which the child is returned." Roszkowski, supra, 274 N.J.Super. at 630, 644 A.2d 1150. "`Any decision on, enforcement, or modification of the custody dispute or decree is left to the appropriate judicial or administrative agency of the child's home State.'" Ibid. (quoting Julia R. Rutherford, Note, Removing the Tactical Advantages of International Parental Child Abductions Under the 1980 Hague Convention on the Civil Aspects of International Child Abduction, 8 Ariz.J.Int'l & Comp. Law 149, 151 (1991)). Thus, the intent of the Convention is to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996).
*706 "Habitual residence" has been defined as "the child's usual place of residence and primary home immediately before he or she was removed to a foreign country." Roszkowski, supra, 274 N.J.Super. at 633, 644 A.2d 1150 (citing 51 Fed. Reg. 10,504 (1980)). It is "akin to domicile; it may be looked at as a place that is the focus of the child's life." Ibid. The Third Circuit has held that it "is the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has `a degree of settled purpose' from the child's perspective." Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir.1995).
The difficulty in this case is that while the Spanish courts recognized New Jersey as the child's habitual residence, they did not find that the child's removal from the State was wrongful under the Convention. Having affirmed that the Convention only determines the habitual residence of the child and that it is well-established that New Jersey was the child's habitual residence before she was removed, we turn to explain why the Hague judgments of the Spanish courts were erroneous as to their findings regarding Innes' rights, and the removal of the child from New Jersey.

B.
The determinations made by the courts of Spain that the child was not wrongfully removed and that Innes possessed no custody rights over the child were flawed for several reasons. The first error made by the Spanish courts was their failure to apply the law of the child's habitual residence, as required by the Convention, to evaluate whether the removal was wrongful.
Article 12 of the Convention instructs in relevant part, "[w]here a child has been wrongfully removed or retained in terms of Article 3 . . . the authority concerned shall order the return of the child forthwith." Pursuant to Article 3, the removal or retention of a child is considered wrongful where:
a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the laws of the State in which the child was habitually resident immediately before the removal or retention; and
b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
[Hague Convention, Art. 3 (Emphasis Added).]
The determination of whether removal was wrongful under the Convention in this case is made by examining: (1) whether the removal violated the custody rights of an individual using New Jersey law; and (2) whether that individual was exercising those rights at that time and would have continued to enjoy them had the child not been removed. Roszkowski, supra, 274 N.J.Super. at 635, 644 A.2d 1150; Feder, supra, 63 F.3d at 226.
It is clear that the removal was wrongful under New Jersey law because absent a court order to the contrary, parents possess equal custody rights to their children. We have long held that, "[i]n a contest between the mother and father, neither has the superior right to the custody of the child." Scanlon v. Scanlon, 29 N.J.Super. 317, 325, 102 A.2d 656 (App.Div.1954); see also Turney v. Nooney, 5 N.J.Super. 392, 397, 69 A.2d 342 (App.Div.1949), certif. denied, 8 N.J. 249, 84 A.2d 669 (1951) (holding that "neither the father nor the mother has the greater right to custody of their child . . ."). "In New Jersey . . . it is well settled that *707 parents have a natural right to the custody of their children." In re Guardianship of C., 98 N.J.Super. 474, 479, 237 A.2d 652 (J. & D.R. Ct.1967). In light of the law of this State, the removal of the child without consent or court order violated Innes' rights of custody and, contrary to the determinations of the Spanish courts, was wrongful.
It is also true that under New Jersey law and the Hague Convention, the October parenting agreement was valid, affirmed Carrascosa's intent that Innes have custodial rights in the child, and when plainly read, demonstrates that the removal of the child was wrongful. Indeed, Article 3 of the Convention provides that custody rights may arise "by operation of law, or by reason of an agreement having legal effect under the law of that State." The parenting agreement having been voluntarily and knowingly executed by both parents, and thus enforceable under the laws of New Jersey, Carrascosa's breach of that agreement was wrongful and violated Innes' custodial rights.
The determinations of the Spanish courts are also erroneous because they were made without regard for the orders entered by the Superior Court granting Innes custody of the child, particularly those made by Judge Parsons in February and March, 2005. Although she did not file an answer, Carrascosa chose to participate in this action to challenge Innes' custody rights and obtain exclusive custody. See, e.g., Salmon v. Salmon, 88 N.J.Super. 291, 314, 212 A.2d 171 (App.Div.1965). Upon doing so, she became subject to the orders of the Family Part. Ibid. After considering the evidence before them, the trial judges presiding in this matter entered orders finding the removal to be wrongful, compelling the child to be returned to New Jersey and awarding custody to Innes. Contrary to the Convention, the Spanish courts disregarded Carrascosa's legal obligations under New Jersey law and repeatedly held that the child's removal was not wrongful. Carrascosa's doubts as to the validity of the trial court's orders in light of the contrary holdings of the Spanish courts, however, never excused her from complying with the orders of the New Jersey court. Ibid. Thus, by not considering the orders of the trial court, the Spanish courts erred and further violated Innes' custodial rights.
Moreover, under our statutory law, Innes possessed rights to the child, even absent a formal judgment of custody. N.J.S.A. 9:2-2 provides in material part:
When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction . . . while under that age [of consent] without the consent of both parents, unless the court, upon cause shown, shall otherwise order.
In the instant matter, there is no dispute that the child was taken outside of the country without the permission or consent of her father, and without the authority of a court order. Under New Jersey law, therefore, the taking of the child to Spain without Innes' consent or knowledge was improper and the holdings of the Spanish courts finding otherwise are in direct contravention with the laws of this state and the Hague Convention. Had the Spanish courts applied the law which governs under the Convention, they would not have arrived at an erroneous result.
As to the second requirement under Article 3, there is credible evidence from Innes' testimony that prior to removal, he was exercising his custody rights and frequently visited with his daughter. There *708 is also evidence that that such contact ended only after the removal of the child to Spain. Thus, Innes would have continued to exercise his custody rights but for the child's removal by Carrascosa. Under New Jersey law, therefore, the removal was wrongful and Innes' custodial rights were violated.
The determinations of the Spanish courts as to the removal of the child and Innes' rights to his daughter were also erroneous under Articles 18 and 19 of the Hague Convention and did not deprive our courts of jurisdiction. To the contrary, Article 18 states that the Convention does "not limit the power of the judicial or administrative authority to order the return of the child." Here, the trial judges in New Jersey ordered the return of the child to New Jersey. Rather than comply with Article 18, however, the Spanish court disregarded the orders of the court. Most importantly, Article 19 of the Convention states, "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."
Here, it was not within the province of the Spanish courts under the Convention to suggest what custodial rights Innes did or did not have. The Spanish courts were instead required by the Convention to apply New Jersey law and order the child to be returned to the state of her habitual residence. The Spanish courts failed to comply with these tasks and, accordingly, our courts are not subject to those determinations by the Spanish tribunals, nor were our courts divested of jurisdiction.

III.
Carrascosa appears to argue that because the Spanish courts have already determined that the removal was not wrongful under the Hague Convention, and because both she and Innes were parties to the Spanish actions, that custody issues are, in effect, res judicata, and that New Jersey courts should not reexamine this matter. We disagree that res judicata is applicable in this case.
"The term `res judicata' refers broadly to the common-law doctrine barring relitigation of claims or issues that have already been adjudicated." Velasquez v. Franz, 123 N.J. 498, 505, 589 A.2d 143 (1991). It provides that "a cause of action between parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be relitigated by those parties . . . in a new proceeding." Ibid. To be accorded res judicata effect, a judicial decision "must be a valid and final adjudication on the merits of the claim." Ibid. Moreover, the matter must be "fairly litigated . . . [such that] it is no longer open to relitigation." Garvey v. Township of Wall, 303 N.J.Super. 93, 98, 696 A.2d 71 (App.Div.1997).
As demonstrated in our prior point, under the Hague Convention, the courts of Spain did not have proper jurisdiction to determine issues of custody, only the habitual residence of the child. In fact, there was never any final determination made by the tribunals of Spain over custody matters, only on whether the removal of the child from New Jersey was wrongful. Since custody was never the primary issue before the Spanish courts, any reference to custody in their decisions was non-binding dicta. Because neither proper jurisdiction was had nor a final determination made by the Spanish courts on the issue of custody, res judicata does not apply.
Res judicata is also inapplicable in this case because there has been no indication that the hearings in Spain were fairly litigated. The record is bare as to witnesses presented, evidence or testimony introduced, or whether the courts of Spain *709 properly considered the best interest of the child in rendering its judgments. Accordingly, the doctrine of res judicata does not prevent our courts from considering the custody matter.

IV.
Carrascosa urges this court to recognize the determinations made by the Spanish courts under principles of international comity. Because New Jersey law was deliberately disregarded, however, and since the Spanish findings contravene the public policy of this state, we cannot afford comity to the courts of Spain in this matter.
Contrary to the Hague Convention, Spanish constitutional and procedural law were applied instead of New Jersey law. In considering the October parenting agreement, for example, the Spanish Provincial Court, Section 10, deliberately disregarded the laws of New Jersey, finding "when, on or about 12 January 2005, the mother brought her daughter to Spain, she breached this agreement. However, in Spain such agreement could only be considered a letter of intent therefore no sanction whatsoever could be imposed for such breach of contract."
The Provincial Court also cited Article 19 of the Constitution of Spain, the Spanish Civil Procedure Act, and Article 20 of the Hague Convention to rule that Carrascosa's "refusal to return the child" was justified because the agreement restricted the rights of "Spanish citizens . . . to freely choose their place of residence." Nowhere in making this determination with regard to residence or custody, however, did the Provincial Court consider the laws of the child's habitual state. It were as if the Hague Convention had no impact in light of the Spanish Constitution, notwithstanding that Spain is a signatory of the Convention. Thus, comity cannot be afforded where the laws of New Jersey were deliberately disregarded contrary to the clear terms of the Hague Convention.
Comity also cannot be afforded to the decisions of the Spanish court because the decisions contravene the public policy of New Jersey with regard to parental rights. Our courts have long held that recognition of foreign judgments should not be given where such decisions violate the public policy of this state:
[t]he principle of comity is not a mere doctrine or rule of the courts. It is a principle involved in the relationships of nations or states with each other . . . applied voluntary by one state or nation in its conduct toward another state or nation . . . When exercised by a court it leads to the recognition and enforcement of the laws of a foreign state where, or to the extent that, such laws do not conflict with the local law, or work injustice on the local citizens or violate the public policy of the local state.
In re Fischer, 119 N.J. Eq. 217, 223, 181 A. 875 (Prerog.Ct.1935); see also Zurich General Accid. & Liab. v. Ackerman Bros., 124 N.J.L. 187, 191, 11 A.2d 52 (E. & A.1940); Buckley v. Huston, 60 N.J. 472, 478, 291 A.2d 129 (1972). In addition, according to the Restatement of the Law, "[a] court need not recognize a judgment of the court of a foreign state if the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States or of the State where recognition is sought." Restatement (Third) of the Foreign Relations Law of the United States, § 482(d) (1986).
The decisions of the Spanish courts not only contravene the dictates of the Hague Convention, but also constitute a wide departure from this State's public policy as stated in N.J.S.A. 9:2-4:

*710 [i]t is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and . . . it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy. In any proceeding involving the custody of a minor child, the rights of both parents shall be equal . . .
Because the holdings of the Spanish Courts contravene the public policy of this state that both parents should share in the custodial rights of the child absent a finding that it would not be in the best interest of the child, comity cannot be afforded.

V.
Carrascosa argues that she filed her religious annulment first, that the ecclesiastic tribunal is recognized by the civil authorities of Spain, that the tribunal can resolve all issues in dispute, including custody, and accordingly, comity should be afforded to the religious court and the courts of Spain. We disagree, and find that because the religious annulment considers different issues and was given no civil effect by the Spanish courts before the complaint was filed in New Jersey, the Superior Court acquired jurisdiction before the courts of Spain, and Carrascosa's argument must fail.
In Bass v. DeVink, we held that in "[a]pplying principles of comity, we have long adhered to the general rule that the court first acquiring jurisdiction has precedence absent special equities." 336 N.J.Super. 450, 455, 765 A.2d 247 (App. Div.), certif. denied, 168 N.J. 292, 773 A.2d 1156 (2001). We also laid a framework for analyzing questions involving the filing of similar litigation in two separate jurisdictions:
The defendant bears the initial burden of establishing three predicate facts:
(1) there is a first-filed action in another state,
(2) both cases involve the same parties, the same claims, and the same legal issues, and
(3) the plaintiff will have the opportunity for adequate relief in the prior jurisdiction.
[Id. at 456, 765 A.2d 247.]
Once these requisites are satisfied, "the defendant enjoys a `clear entitlement to comity  stay relief'" Ibid. (quoting American Home Products Corp. v. Adriatic Ins. Co., 286 N.J.Super. 24, 668 A.2d 67 (App. Div.1995)). A plaintiff can defeat a defendant's entitlement to comity only by showing that "special equities exist, and that they are sufficiently compelling to allow the action to proceed."[2]Ibid. When determining whether to award comity, the court must consider which action was filed first because "where a foreign action is already pending . . . it does not make sense for New Jersey courts to plow the same row over again." Id. at 457, 765 A.2d 247.
The first question that must be considered, therefore, is whether there is a first-filed action in another state. In this case, Carrascosa filed for a religious annulment of the marriage with the Ecclesiastic Tribunal of the Archdiocese of Valencia in early 2004 and she has asserted that the marriage was annulled by that entity on November 6, 2004. Innes filed his complaint seeking termination of the marriage and joint legal custody on December 10, *711 2004. Relying upon Spanish and Canon law, Carrascosa claims that since the religious annulment was granted by the Church before Innes' divorce action was filed, the courts of New Jersey should not exercise jurisdiction over issues of divorce or custody in this matter on comity principles. Since Carrascosa did not file any action in another "state" but rather, before a religious tribunal which is independent of any civil government, we disagree.
Contrary to the assertions of Carrascosa, the Constitution of Spain does not provide that ecclesiastic judgments by the Church are given automatic civil effect. See Constitucíon Española, Part I, Ch. 2, § 16. According to clause VI of the Agreement of 28 July 1976 between the Holy See and the Spanish State, "ecclesiastical resolutions shall be considered valid under civil law if declared in compliance with State Law by sentence of the competent Civil Court." Boletín Oficial del Estado (B.O.E.), 1976, 230. In this case, no civil recognition of an annulment was made by a competent, Spanish civil court. In fact, Carrascosa has provided no proof that the ecclesiastic tribunal actually granted an annulment. Accordingly, even assuming that a religious annulment had been granted, without civil recognition by the Spanish courts before the filing of the Superior Court action, an ecclesiastical annulment alone would not be cognizable in New Jersey as a first-filed action.
The next question that must be addressed is whether Carrascosa has shown that "both causes involve the same parties, the same claims, and the same legal issues." Bass, supra, 336 N.J.Super. at 456, 765 A.2d 247. An analysis of ecclesiastical canon law and the laws of Spain demonstrates that while the parties are the same, the claims and issues before the ecclesiastic tribunal and the Superior Court are not identical.
Canon 1672 states, "[c]ases concerning the merely civil effects of marriage pertain to the civil authority, unless particular law lays down that, if such cases are raised as incidental and accessory matters, they may be heard and decided by an ecclesiastical judge." 1983 CODE c. 1672. In addition, according to a canon law treatise on marriage, "[t]he Church exerts no exclusive claim to jurisdiction over civil matters pertaining to marriage, such as issues related to alimony and the custody of children." Klaus Lüdicke & Ronny E. Jenkins, Dignitas Connubi: Norms and Commentary, Art. III, comment 4 (Canon Law Soc. of America, 2006).
Carrascosa has not provided any Spanish law that delegates or authorizes an ecclesiastic court to exercise authority over "civil effects" of marriage. To the contrary, Article 80 of the Spanish Civil Code permits civil enforcement of ecclesiastic judgments only if such resolutions are declared by a civil court to be compatible with specific provisions of the Spanish Civil Judgment Law. Código Civil: Book I: Title IV, Article 80. Therefore, an ecclesiastic court, could not resolve the issues of custody presented in this case. On the other hand, the action commenced in the Superior Court sought to adjudicate both divorce and custody rights. Accordingly, Carrascosa has failed to demonstrate that the issues and legal claims were the same as in the ecclesiastic court.
The third prerequisite that must be considered is "the opportunity for adequate relief in the prior jurisdiction." Bass, supra, 336 N.J.Super. at 456, 765 A.2d 247. Because the claims and issues were not similar in the ecclesiastic matter and the Superior Court action, there was no showing made that the ecclesiastic court would have considered the best interests of the child. Carrascosa, therefore, has failed to show that the parties would have an opportunity *712 for adequate relief in the ecclesiastic tribunal regarding the question of child custody. Consequently, comity cannot be afforded to the religious annulment of the Church.
It should also be noted that the decisions of the Spanish courts need not be recognized by the courts of this State because they are not entitled to full faith and credit under the International Child Abduction Remedies Act. Pursuant to this Act, full faith and credit need only "be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this Act." 42 U.S.C. § 11603(g). This section does not require "a federal or state court in the United States to accord full faith and credit to a Hague petition adjudication of another country." Diorinou v. Mezitis, 237 F.3d 133, 142 (2d Cir. 2001).[3] Indeed, it is well-established that "judgments rendered in a foreign nation are not entitled to the protection of full faith and credit." Ibid. (quoting Restatement (Second) of Conflict of Laws, § 98 cmt. b (1971)). Because the holdings of the Spanish courts are not entitled to full faith and credit, do not consider New Jersey law, and are violative of the public policy of this State, comity need not be afforded in this case.

VI.
We next examine Carrascosa's claims that her constitutional rights were infringed by trial deficiencies. In reviewing the record, we find her arguments to be without merit.
Carrascosa submits that the trial court limited her introduction of evidence and thus did not allow her to prove her case. However, because Carrascosa only filed a "limited notice of appearance" in this case, under the court rules she was in default and was not entitled to introduce all of the evidence that she wanted to present. Indeed, according to R. 5:4-3, the only responsive pleadings permitted are answers, general appearances, or acknowledgments of service, none of which Carrascosa filed. Therefore, as Carrascosa was in default, the court's limiting her introduction of evidence was not in violation of her constitutional rights.
Carrascosa was also in default of court orders compelling her to attend custody evaluations. Despite the court permitting her to attend these evaluations by teleconference, Carrascosa deliberately chose not to participate. R. 4:23-2(b)(3), made applicable to the Family Part by R. 5:1-1, states in material part, if a party:
. . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make . . . [a]n order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof with or without prejudice, or rendering a judgment of default against the disobedient party.
In light of this Rule, Carrascosa's purposeful disregard of the court's prior orders, *713 and under the tenets of R. 4:43-2(b), the trial judge acted reasonably and within his authority in limiting Carrascosa's testimony and her introduction of evidence. See Douglas v. Harris, 35 N.J. 270, 277-78, 173 A.2d 1 (1961); see also Jugan v. Pollen, 253 N.J.Super. 123, 129-30, 601 A.2d 235 (App.Div.1992), certif. denied, 138 N.J. 271, 649 A.2d 1291 (1994) (holding that it is well-settled under R. 4:43-2(b), that "whether a defaulting party may cross-examine liability witnesses against him is a matter of judicial discretion."). Indeed, we have recognized that when faced with a defaulting defendant, a trial judge may limit or restrict a wide array of that party's participation in a proceeding, "namely the offering of direct liability witnesses and the making of opening and closing statements to the jury." Id. at 130, 601 A.2d 235. Such restrictions of participation against a purposefully defaulting party have been found to be "thoroughly consistent with substantial justice." Perry v. Crunden, 79 N.J.Super. 285, 293, 191 A.2d 316 (Law Div.1963). Thus the trial judge did not abuse his discretion in limiting Carrascosa's participation in the trial. See Kolczycki v. City of East Orange, 317 N.J.Super. 505, 512, 722 A.2d 603 (App.Div.1999).
Moreover, although in custody proceedings both parents have a constitutional right to present their proofs because they "have a fundamental interest in their relationships with their children," this right is not absolute under the fugitive disentitlement doctrine. Matsumoto v. Matsumoto, 171 N.J. 110, 133, 792 A.2d 1222 (2002). Under this doctrine, a parent's right to present evidence in a custody case is not guaranteed "in a case in which the fugitive parent has removed or hidden the child, thereby making enforcement improbable in the event of a decision unfavorable to the fugitive parent." Ibid.; see also Pesin v. Rodriguez, 244 F.3d 1250, 1253 (11th Cir.2001) (holding that the fugitive disentitlement doctrine is applicable in both civil and criminal actions where litigants repeatedly defy court orders and adverse rulings, ignore contempt sanctions and evade arrest). In this case, Carrascosa is accountable for illegally removing her daughter to Spain and continually violating subsequent court orders compelling her return. Accordingly, under this doctrine, the court was also acting within its authority in limiting her testimony and proofs.
In addition, although Carrascosa argues that she was deprived of her right to testify at trial, in fact, the record reveals that she chose not to testify for fear of further prosecution. The trial court made every effort to accommodate Carrascosa throughout the entire litigation and did not express any form of bias against her. Her due process rights were not infringed by the court.
Carrascosa also claims that the trial court failed to consider the child's best interests in rendering its custody determination. The record reveals, however, that the trial judge carefully reviewed each of the various "best interest" factors outlined in N.J.S.A. 9:2-4C. The record also shows that the court recognized that the child was suffering continuing harm by being separated from both of her parents, particularly her father, as a result of Carrascosa's failure to comply with court orders. Thus, the court made the child's best interests paramount in its consideration and did not violate Carrascosa's due process rights. See Beck v. Beck, 86 N.J. 480, 497, 432 A.2d 63 (1981).
Carrascosa expresses concern that future proceedings should not be heard by Judge Torack. Our review of the entire record and specifically the actions and statements of the trial judge, however, provide no cause for us to question or *714 direct the matter to be heard by another judge.

VII.
Appellant argues that the court's imposition of a lien in the sum of $148,000, in favor of Innes, was arbitrary, violated her due process rights and was an abuse of discretion. We find, however, that there was no abuse of discretion by the trial court.
In its August 24, 2006 order, the trial court ordered Carrascosa to return Victoria to Innes. It also directed Carrascosa to cease continuing all civil litigation in Spain pertaining to the marriage and ordered her to file a dismissal of all Spanish actions concerning the marriage. We recognize that a Spanish court order exists forbidding Victoria from leaving Spain. However, our court did not merely order Carrascosa to return Victoria to New Jersey, but explicitly ordered her to cease prosecuting and dismiss the legal actions in Spain which would permit Victoria to return from Spain. It is her defiance of those specific orders which resulted in her incarceration and sanctions. See Anyanwu v. Anyanwu, 333 N.J.Super. 345, 755 A.2d 656 (App.Div.2000), certif. denied, 170 N.J. 388, 788 A.2d 773 (2001); see also R. 1:10-3.
R. 5:3-7(a) permits the imposition of economic sanctions "[o]n finding that a party has violated an order respecting custody." However, "[w]hile a monetary sanction payable to the aggrieved party is not necessarily limited to the amount of the aggrieved party's actual damage, it must nevertheless be rationally related to the desideratum of imposing a `sting' on the offending party within its reasonable economic means." Pressler, Current N.J. Court Rules, comment 4.4.3 on R. 1:10-3 (2007); see also East Brunswick Bd. of Educ. v. Educ. Assoc., 235 N.J.Super. 417, 422, 563 A.2d 55 (App.Div.1989).
In this case, sanctions were originally imposed at $100 per day. Because of Carrascosa's continued non-compliance, the trial court subsequently raised this amount to $500 per day. A trial judge, when awarding relief to litigant's rights is "obliged to balance the interests of the party for whose benefit the order issued against those of the party-obligor, without losing sight of the legal system's interest in the integrity of judicial orders." Anyanwu, supra, 333 N.J.Super. at 351-52, 755 A.2d 656. Due to Carrascosa's failures to comply and her status as a disentitled fugitive under Matsumoto, supra, she is not entitled to a rehearing on the sanctions at this time. In light of Carrascosa's repeated violations of court orders, the trial court did not err in imposing the sanctions complained of.

VIII.
Carrascosa lastly argues that trial court abused its discretion and violated her Fifth Amendment rights when it denied her request for a stay of the sanctions portion of the trial based upon the pending criminal investigation. The trial court, however, did not violate her constitutional rights by denying her request for a stay of the civil action.
Our courts have recognized that "[t]here is no absolute rule in New Jersey or elsewhere by which civil actions must be suspended as a matter of right to await the event of an indictment pending in relation to the subject matter of the suit." Nat'l Freight v. Ostroff, 133 N.J.Super. 554, 558-59, 337 A.2d 647 (Law Div.1975). It has been also recognized that, "[w]hile defendant ought not to be compelled to convict [herself] criminally, plaintiff and the other parties ought not to be compelled to await the determination of their rights, *715 pending a future course of action which is out of the control of [the] parties and, indeed, the court." Ibid.; see also Mahne v. Mahne, 66 N.J. 53, 59, 328 A.2d 225 (1974), certif. denied, 75 N.J. 22, 379 A.2d 253 (1977) (holding that if a litigant refuses to respond to discovery based upon his or her exercise of the right against possible self-incrimination, the trial court may, in its discretion, preclude the litigant from testifying on the subject at trial).
In this case, Carrascosa knew that she was being criminally investigated, and considering the age of the case and the continuing harm being suffered by Innes, the court was under no obligation to grant her stay on the issue of sanctions while her criminal proceeding was pending. Neither the trial court nor Innes should have been expected to remain passive as to the issue of sanctions while a criminal proceeding was pending. Indeed, it is a well-established principle that "[t]he constitutional rights of the defendant must be protected, but the constitutional rights of the plaintiff to his day in court must likewise be protected." Nat'l Freight, supra, 133 N.J.Super. at 559, 337 A.2d 647 (quoting People ex rel. Moll v. Danziger, 238 Mich. 39, 213 N.W. 448, 451 (1927)). The trial court, therefore, did not err in rejecting Carrascosa's request for a stay.

IX.
In this case, the situation Carrascosa faces is not fixed. She has the opportunity to change the status quo as to her incarceration, the economic sanctions and her child's custody. We note that "a judgment involving the custody of minor children is subject to modification at any time upon the ground of changed circumstances." Sheehan v. Sheehan, 51 N.J.Super. 276, 287, 143 A.2d 874 (App.Div.), certif. denied, 28 N.J. 147, 145 A.2d 358 (1958); see also In re Erving, 109 N.J. Eq. 294, 157 A. 161 (Ch.Div.1931). A party seeking such modification bears the burden of proof and a primary consideration of the court is the welfare of the child. Sheehan, supra, 51 N.J.Super. at 287-88, 143 A.2d 874.
It appears evident to us that upon Carrascosa's compliance, especially given the time which has passed during which Innes has had no contact with Victoria, there would be a change in circumstances. See generally, Sorentino v. Fam. and Children's Soc. of Eliz., 74 N.J. 313, 322-23, 378 A.2d 18 (1977). Such a change would warrant a plenary hearing to determine custody and the reasonableness of the amount of sanctions imposed. See Sheehan, supra, 51 N.J.Super. at 287, 143 A.2d 874; Matsumoto, supra, 171 N.J. at 132, 135, 792 A.2d 1222. Pursuant to Matsumoto and Sheehan, supra, Carrascosa will then be entitled to a plenary hearing where she may introduce reports and other evidence for a final determination on custody and on the amount of economic sanctions imposed. However, such a hearing can only be provided after Carrascosa complies with the outstanding court orders requiring her to return the child to New Jersey and terminate all litigation in Spain. Only then can the welfare of the child, the reasonableness of sanctions and other issues be considered by the trial court in a plenary hearing.

X.
We have carefully and thoroughly reviewed the entire record in this sad affair. A young girl, who has the benefit of citizenship in the United States and Spain, is now deprived of the opportunity to experience the wonders of both of these two great countries' rich geographic, cultural, artistic, and educational advantages. Most importantly, she does not have the nurturing care of either of her parents at a time *716 in her life when they each could and should be playing a loving beneficial role. These parents' inability to resolve their differences results in their child's suffering.
We are charged with resolving the legal issues presented according to law  a task we have completed. Tragically, our resolution of these legal issues does not result in the immediate amelioration of this young child's predicament. That unfortunately, will require action on the part of Innes and Carrascosa, particularly Carrascosa, to act in their daughter's best interest.
For the reasons set forth above, the judgment and orders entered by the trial court are affirmed.
NOTES
[1] The court considered the following factors in rendering its determination: (1) parent's ability to agree, communicate and cooperate in matters relating to the child; (2) parties' willingness to accept custody; (3) history of unwillingness to allow visitation; (4) interaction and relationship of the child with its parents and siblings; (5) history of domestic violence; (6) safety of the child; (7) child's preferences; (8) needs of the child; (9) stability of the home environment offered; (10) quality and continuity of the child's education; (11) fitness of the parents; (12) geographic proximity of the parents' homes; (13) parents' employment and responsibilities; (14) age and number of children.
[2] Given Carrascosa's contempt for the numerous New Jersey court orders, "special equities" may well exist.
[3] Diorinou, supra, stands for the principle that although New Jersey courts normally accord deference to foreign adjudications, "judgments rendered in a foreign nation are not entitled to full faith and credit . . . . [a] particular case may disclose such defects as to make a particular judgment not entitled to recognition." 237 F.3d at 142-43. Thus, Carrascosa's reliance on this case is misplaced because rather than supporting her position, it supports the determinations of this court that the Spanish tribunals failed to uphold the Hague Convention and principles of international comity and their determinations do not, therefore, merit recognition under comity principles.